75 S.W.3d 794 (2002)
In the Interest of C.J.G. (Child), D.S.B and D.R.B. (Adoptive Parents), Respondents,
v.
D.G.P. (Putative Father), Appellant.
No. WD 60800.
Missouri Court of Appeals, Western District.
March 26, 2002.
Motion for Rehearing and/or Transfer Denied April 30, 2002.
Application for Transfer Denied June 25, 2002.
*795 Steven E. Raymond, Esq., Shelbyville, Atty. and Guardian for C.J.G.
Phoebe P. Herrin, Esq., Macon, Attorney for D.G.P.
Before ULRICH, P.J., BRECKENRIDGE and HARDWICK, JJ.
Motion for Rehearing and/or Transfer to Supreme Court Denied April 30, 2002.
LISA WHITE HARDWICK, Judge.
This appeal arises from the termination of a putative father's parental rights and the adoption of his child based on abandonment. We reverse the trial court's judgment, as the record does not provide clear, cogent and convincing evidence of abandonment to support the termination and adoption.

FACTUAL AND PROCEDURAL HISTORY[1]
B.J.G. (Mother) gave birth to C.J.G. on June 17, 1999. On April 14, 2000, the Shelby County Juvenile Court assumed jurisdiction over C.J.G. at the request of Mother, who herself was a juvenile and a ward of the court. The court left C.J.G. in Mother's custody under the supervision of the Missouri Division of Family Services (DFS). During a meeting with DFS in April 2000, Mother identified D.G.P. and three other men as possible fathers of C.J.G. None of the putative fathers were given notice of the juvenile case at that time.
On May 17, 2000, DFS placed C.J.G. in protective custody after concluding that Mother failed to provide a proper home. The juvenile case was thereafter transferred to Macon County, where the child was placed in foster care.
In early August 2000, Mother agreed to consent to a termination of her parental rights and to allow D.R.B. and D.S.B. (Adoptive Parents) to adopt C.J.G. The child was placed in Adoptive Parents' custody on August 10, 2000. As part of the consent process, Mother completed a form identifying two men, D.G.P. and R.W.H., as putative fathers of C.J.G.
On August 24, 2000, D.G.P. was notified of the protective custody case by summons served at the Booneville Correctional Facility, where he was incarcerated. D.G.P. sent a letter to the court on October 6, 2000, requesting appointment of counsel *796 and advising that his sister would seek guardianship of C.J.G. pending his release from prison.
Also on October 6, 2000, Adoptive Parents filed a Petition for termination of parental rights, approval of consent to adoption, and adoption of C.J.G. Mother and R.W.H. filed consents to the termination and adoption.
D.G.P. was served with notice of the Adoptive Parents' Petition on October 19, 2000. In response, he sent a letter to the court admitting his paternity, again requesting appointment of counsel, and advising that his sister could take custody of C.J.G. until his scheduled release from prison in four months.
Upon appointment of counsel, D.G.P. filed an Answer to the Petition and a motion for paternity testing on November 27, 2000. Adoptive Parents opposed the motion, arguing the juvenile court did not have subject matter jurisdiction to order paternity testing. The court denied the motion in a docket entry on December 22, 2000.
The court held a hearing on the termination and adoption Petition on March 12, 2001. Adoptive Parents testified D.G.P. had made no effort to contact C.J.G. since they acquired custody of the child on August 10, 2000. A DFS caseworker similarly testified D.G.P. had not communicated or visited with C.J.G., nor provided any financial support for the child, during the pendency of the protective custody case.
The Juvenile Officer testified D.G.P. was notified of the protective custody case in August 2000, but did not inquire about visitation with C.J.G. until November 2000. The Juvenile Officer denied the visitation request at that time because the termination case had been filed, and the Juvenile Officer believed adoption was in the child's best interest. Although D.G.P. telephoned the Juvenile Officer several times during August through October 2000, he only sought information about the court proceedings and did not ask any questions about C.J.G.'s welfare or location.
D.G.P. was called as a witness during the Adoptive Parents' case-in-chief. D.G.P. testified he had a sexual relationship with Mother in September 1998 and subsequently learned she was pregnant. On June 2, 1999, two weeks before giving birth, Mother told D.G.P. that he was not the father of the child.
The next time D.G.P. heard from Mother was in January 2000, when she wrote a letter to him in prison. D.G.P. had been incarcerated since August 1999, due to his probation revocation for failure to provide proof of employment. Mother's letter, dated January 21, 2000, informed D.G.P. that he was the father of C.J.G., who was then seven months old. At the time of the March 12, 2001, hearing, D.G.P. was still incarcerated[2] and had never visited with or seen the child. He also had not provided financial support for C.J.G., despite receiving prison income of at least $7.50 monthly.
After hearing the evidence, the trial court entered an order terminating D.G.P.'s putative parental rights and declaring he had no right to consent to the adoption of C.J.G. The court found that D.G.P. willfully abandoned C.J.G. by failing to provide financial support and by failing to make arrangements to visit or communicate with the child in the six months prior to the filing of the Petition *797 for termination/adoption.[3] Final judgment was entered April 30, 2001, granting the adoption of C.J.G.
On appeal, D.G.P. raises three points of error. In Points I and II, he asserts the trial court erred in determining his consent to the adoption was not required. In Point III, he argues the termination of parental rights was not supported by clear, cogent and convincing evidence of abandonment, and the trial court failed to make findings that the termination was in the child's best interest. We address Point III first, as it is dispositive of the remaining issues.

STANDARD OF REVIEW
The trial court's termination of parental rights must be affirmed unless it is not supported by substantial evidence, it is against the weight of the evidence, or it erroneously declares or misapplies the law. In the Interest of Z.H., 5 S.W.3d 567, 569 (Mo.App. W.D.1999). We review the facts and all reasonable inferences therefrom in the light most favorable to the trial court's judgment. Id.

ANALYSIS
Section 211.447.5[4] provides for the termination of parental rights if clear, cogent and convincing evidence shows the parent has abandoned the child and if termination is in the child's best interest. A child over one year of age has been abandoned if, for a period of six months or longer, "[t]he parent has, without good cause, left the child without any provision for parental support and without making arrangements to visit or communicate with the child, although able to do so." § 211.447.4(1)(b).
Abandonment is defined as the voluntary relinquishment of child custody with the intention the severance be of a permanent nature, or as the intentional withholding by a parent of his care, love, protection and presence without just cause or excuse. In the Interest of R.K., 982 S.W.2d 803, 806 (Mo.App. W.D.1998). Abandonment focuses on the parent's intent, taking into consideration all evidence of the parent's conduct before and after the applicable statutory period. In the Interest of G.M.T., 965 S.W.2d 200, 202 (Mo.App. E.D.1998).
In its order terminating D.G.P.'s parental rights, the trial court made the following findings to support the determination of abandonment:
a. [D.G.P.] communicated regularly with the mother ....from approximately January 2000 through August 2000.
b. [D.G.P.] was aware of the child's placement in foster care by the Division of Family Services in May 2000.
c. [D.G.P.] has failed to contribute financially towards the care and maintenance of the child. [He] was employed prior to his incarceration in August 1999. While in the Department of Corrections, [he] has earned $7.50 per month, except for at least one month in which he earned $25.00.
*798 d. [D.G.P.] failed to visit or make arrangements with the Division of Family Services or Juvenile Officer to visit with the child, prior to the filing of the Petition for Adoption.
e. [D.G.P.] has failed to communicate or make arrangements to communicate with the child.
f. [D.G.P.] failed to communicate with the Division of Family Services, Juvenile Officer and the Court prior to the filing of the Petition for Adoption.
D.G.P. contends the court's findings in paragraphs a, b, d, e and f are not supported by the evidence. Relying on the "good cause" language of § 211.447.4(1)(b), he argues Mother initially deceived him about C.J.G.'s paternity, then concealed the birth and frustrated his efforts to visit and communicate with the child from prison. He alleges he sought and followed advice from DFS and the Juvenile Officer concerning the juvenile case, and that he later requested and was denied visitation with C.J.G. D.G.P. concedes his failure to financially support C.J.G., but he points out that abandonment requires proof of both a lack of support and a failure to make "arrangements to visit or communicate with the child." § 211.447.4(1)(b). He seeks reversal of the termination decision based on the absence of clear, cogent and convincing evidence that he was able to communicate or visit with C.J.G. and failed to do so.
In response, Adoptive Parents contend the termination decision is supported by undisputed evidence that D.G.P. has never seen or visited C.J.G. Although D.G.P. alleges he sent cards to C.J.G. and letters to Mother, the court was entitled to regard such efforts as token because a parent cannot avoid abandonment by maintaining a superficial or tenuous relationship with the child. In the Interest of R.K., 982 at 806. D.G.P.'s incarceration during the six-month period preceding the filing of the termination/adoption Petition did not constitute good cause under the termination statute. Incarceration "does not discharge a parent's statutory obligation to provide his child with a continuing relationship through communication and visitation....." Id.
Adoptive Parents cite In the Interest of S.L.J., 3 S.W.3d 902 (Mo.App. S.D.1999) in support of the trial court's ruling. In S.L.J., a mother became pregnant approximately one and one-half months before father's arrest and incarceration in October 1990. Father claimed he was unaware mother was pregnant or had given birth until he was notified of a paternity action in 1993, when S.L.J. was two years old. He then telephoned mother from prison (where he was serving a fifteen-year sentence for murder) and spoke with the child on one occasion. One month later, S.L.J. was placed in DFS custody. Father eventually learned the child was in DFS custody but had no contact with her or DFS officials for two years. In 1995, father obtained the child's address from DFS and began sending birthday cards and letters on an inconsistent basis. Father had no other contact with the child through 1998, when the Juvenile Officer filed a petition to terminate his parental rights for abandonment. The termination was granted and affirmed on appeal, based on evidence that father "failed to make arrangements to visit or communicate with S.L.J."
D.G.P. argues that the facts of S.L.J. contrast sharply with the uncontroverted evidence of his consistent efforts to communicate with Mother, DFS, the Juvenile Officer and the court concerning C.J.G. from the time he first learned of her birth in January 2000 through the termination of his rights in March 2001. In S.L.J., the putative father did nothing for two years *799 after learning his child was in DFS custody, and then sent only infrequent holiday greetings for three years prior to the termination filing. While both cases involve some evidence of initial concealment by the mother, the evidence in the instant case reflects that D.G.P. did more than send a few cards or letters to establish a relationship with C.J.G.
At the termination hearing, D.G.P. testified that he maintained a relationship with Mother prior to and during her pregnancy. He believed he was the unborn child's father until two weeks before the birth when he visited Mother in the hospital. Mother told D.G.P. he was not the child's father and instructed him to leave immediately because the true father would arrive at the hospital soon. D.G.P. left as instructed.
He heard nothing further until late January 2000, when Mother sent a letter stating he was the father of seven-month old C.J.G. Over the next few weeks, D.G.P. sent cards to C.J.G. and at least thirty letters to Mother regarding his desire to renew their relationship and live as a family upon his release from prison. Mother sent letters every three or four days, expressing her love for D.G.P. and promising to await his return.
In mid-February 2000, D.G.P. requested that Mother complete paperwork to allow her and C.J.G. to visit him in prison. Mother agreed to fill out the papers and promised that arrangements were being made for blood tests to confirm D.G.P.'s paternity of C.J.G. However, two weeks later, Mother notified D.G.P. that her plans had changed. She intended to marry another boyfriend, Jimmy, who had just been released from prison. D.G.P. unsuccessfully attempted to contact Mother after receiving this news in her March 13, 2000, letter. He was able to add Mother and C.J.G. to his visitation list on March 17, 2000, but Mother never brought the child to visit. After Mother's March 13 letter, D.G.P. never received any response to his cards and letters during the rest of March, April, or May, 2000.
Adoptive Parents filed their Petition for termination/adoption on October 6, 2000. Pursuant to § 211.447.4(1)(b), they alleged D.G.P. had abandoned the child for six months preceding the filing of the Petition. Thus, the statutory abandonment period began April 6, 2000, at a time when Mother had severed contact with D.G.P. and he had no knowledge of the child's whereabouts. D.G.P.'s testimony that he unsuccessfully attempted to contact Mother during late March, April, and May 2000, is corroborated by the juvenile court's assumption of jurisdiction over C.J.G. on April 14, 2000, and DFS's action in taking custody of the child on May 17, 2000, due to Mother's failure to maintain a proper home. In the Petition requesting protective custody, the Juvenile Officer stated that Mother and C.J.G. moved seven times between April 14 and May 17, 2000, staying with six different relatives or friends in five cities.
Although Mother disclosed D.G.P.'s name to DFS as a putative father of C.J.G. in April 2000, neither DFS nor the Juvenile Officer notified D.G.P. of the juvenile court proceedings. The Juvenile Officer testified D.G.P. was generally known in the community, and the juvenile authorities were aware he was in prison and could be contacted without great difficulty. The Juvenile Officer decided against contacting D.G.P. in April 2000, because she considered Mother's information unreliable regarding the putative fathers. Despite this unreliability, the DFS caseworker testified the juvenile authorities trusted Mother to notify D.G.P. about the juvenile court proceedings.
*800 D.G.P. had no knowledge that DFS had taken custody of the child until Mother notified him by letter in early June 2000. In the letter, Mother said she no longer planned to marry Jimmy, and she expected to regain custody of C.J.G. upon finding a job and a place to live. D.G.P. felt he could no longer rely on Mother's assurances, so he asked his sister, Amy, in June 2000, to seek guardianship of C.J.G. to allow him to maintain communication with the child pending his release from prison. Amy agreed and contacted DFS, on D.G.P.'s behalf, to request a home study regarding her fitness for custody of the child.
Neither DFS nor the Juvenile Officer made any effort to contact D.G.P. or notify him of the protective custody case until Mother decided to consent to a termination of parental rights in August 2000. D.G.P. was served with formal notice of the ongoing juvenile case on August 24, 2000, but received no information about C.J.G.'s placement. In response, he made several telephone calls to DFS and the Juvenile Office in August, September, and October 2000, to inquire about how to protect his parental rights. He was advised to contact an attorney and given no further information. D.G.P. also questioned a DFS official about the status of the home study to allow Amy to gain custody of C.J.G. Although DFS assured D.G.P. and Amy that paperwork was in progress, the home study was never conducted.
The Juvenile Officer testified that a decision had been made by August 2000 to terminate D.G.P.'s parental rights, and there was nothing D.G.P. could have donein terms of visitation, financial support, or communication with C.J.G.that would have changed her opinion thereafter. This decision was made at least two months before the six-month statutory abandonment period elapsed, and prior to the time D.G.P. was given formal notice of any legal proceedings. C.J.G. was placed in the custody of Adoptive Parents even before D.G.P. was notified of the juvenile case, and even though DFS knew D.G.P.'s sister was attempting to gain custody to help preserve his parental rights. DFS and the Juvenile Officer had known D.G.P. was a putative father since the juvenile case was filed in April 2000, but opted to give him no notice of the proceedings until August 2000, when they had already determined to terminate his parental rights and provide no assistance or allow him to have contact with C.J.G.
Once D.G.P. learned that neither DFS nor the Juvenile Officer would provide information or assistance, he wrote the court a letter on October 6, 2000, requesting appointment of counsel and permission for his sister to take custody of C.J.G. A few days later, he was served with the termination Petition and promptly sent another letter to the court, admitting his paternity, requesting counsel, and referencing his sister as a temporary custodian for the child pending his release from prison in four months.
After counsel was appointed, D.G.P. sought visitation with C.J.G., which the Juvenile Officer denied. He filed a motion to prove his paternity through blood testing, but the trial court denied the request. He then filed a separate paternity action that was ultimately mooted by the judgment terminating his parental rights and granting the adoption of C.J.G.
Unlike the putative father in S.L.J., there is evidence D.G.P. made consistent efforts to preserve his paternity interests and gain access to the child prior to, during, and subsequent to the filing of the statutory abandonment period. D.G.P.'s efforts were initially frustrated by Mother's non-cooperation and elusiveness, and then by the failure of the juvenile authorities *801 to promptly notify him of the juvenile case or provide meaningful responses to his requests for assistance made during the statutory abandonment period.
We find this case similar to In the Interest of Baby Girl W., 728 S.W.2d 545 (Mo.App. W.D.1987), where the facts were undisputed that a mother moved to another town to conceal the birth of her child from the putative father. Mother consented to an adoption and relinquished custody of the child to the court upon birth. Mother precluded father from having any information or access to the child until after a juvenile case had been filed and the statutory abandonment period had begun to run. Father first received notice of the juvenile case while he was imprisoned, and he thereafter actively opposed the termination of his parental rights. Although father made no effort to financially support, visit or communicate with the child, the appeals court noted that he "sought appointment of counsel ... in the termination action, ....testified and resisted the efforts of juvenile officer to deprive him of his parental status," and then prosecuted the case on appeal when the trial court granted the termination. Id. at 549. The appeals court reversed the termination, holding the evidence did not show father's intent to abandon the child. Id.
To prove abandonment, there must be evidence which shows the accessibility of the child for purposes of visitation and communication. In the Interest of G.M.T., 965 S.W.2d at 203. Where a parent's access to the child was precluded by deception, concealment, or by the refusal of juvenile authorities to respond to reasonable requests for information and assistance, it is necessary to consider whether the parent's conduct indicates an intent to abandon the child.
Abandonment implies a willful positive act, such as deserting the child. Baby Girl W., 728 S.W.2d at 549. It is the voluntary relinquishment of custody with the intent never again to claim the rights or duties of a parent. Id. Thus, a finding of abandonment is incompatible with a situation where a child has been taken from a parent involuntarily, such as in protective custody cases. G.M.T., 965 S.W.2d at 203. The forced separation operates to create the very circumstances, i.e., lack of communication and visitation, complained of in the termination proceeding. Baby Girl W., 728 S.W.2d at 549.
These circumstances served as the bases for termination of D.G.P.'s parental rights. During the entire six month period of alleged abandonmentApril 6 through October 6, 2000, D.G.P. had no access to C.J.G. initially because of Mother's concealment and then because the child was taken into DFS custody. D.G.P. made efforts to visit with and communicate with the child as long as he believed she was in Mother's custody. Upon learning the child was in DFS custody, he directed his efforts toward legal proceedings to allow his sister to gain custody so that he could directly communicate and arrange visitation with C.J.G. D.G.P. has persistently taken steps to protect his parental rights and establish a relationship with his child, up through and including this appeal.
D.G.P.'s testimony at trial was uncontroverted and, in fact, was largely corroborated by the testimony of the DFS representative and the juvenile officer. Nonetheless, the trial court was not required to believe his version of events, and we recognize our duty to defer to its credibility findings.[5] Even if the court *802 found no merit in D.G.P.'s position, its judgment must be supported by evidence in the record. We agree with D.G.P. that the court's critical findings of abandonment are deficient in this regard.
The court's abandonment determination included a finding that D.G.P. "communicated regularly with [Mother] .... from approximately January 2000 through August 2000." D.G.P.'s testimony and his letters from Mother were the only evidence in the record regarding their communications.[6] The evidence indicated he and Mother exchanged frequent correspondence between January 31, 2000 and March 13, 2000. D.G.P. received no communication from Mother for the rest of March, April, and May 2000. In early June 2000, he received a single letter from Mother. Nothing in the record indicates that D.G.P. had any further contact with Mother for the rest of June, July, and August 2000. The evidence, therefore, does not support the court's finding that Mother and D.G.P. "communicated regularly" during January through August 2000. It is particularly relevant that there is no evidence of regular communication between the natural parents from mid-March through August 2000, a substantial portion of the statutory abandonment period.
Similarly, there is no evidence in the record to support the court's finding that D.G.P. "failed to communicate with the Division of Family Services, Juvenile Officer and the Court prior to the filing of the Petition for Adoption." The Juvenile Officer testified that D.G.P. telephoned her from prison "several times" in August and September 2000, prior to the adoption case filing on October 6, 2000. A DFS Caseworker, Yvette Collins, also testified that D.G.P.'s sister contacted DFS, on D.G.P.'s behalf, in the late summer or fall of 2000, to request a home study for alternative placement of C.J.G. This evidence is consistent with D.G.P.'s testimony that he requested his sister to pursue a home study in June 2000. He followed up on the request by contacting Kyle Kendrick of DFS to inquire about the status of the home study. The collective testimony of all three witnesses demonstrates the court's finding that D.G.P. failed to communicate with the juvenile authorities was not only unsupported by the evidence, but also against the weight of the evidence.
While there are additional minor disparities in the court's findings,[7] those explained herein are sufficient to support D.G.P.'s claim of reversible error. The court's critical findings of abandonment are unsupported by the record. The court's ultimate conclusion that D.G.P. failed to make arrangements to visit or communicate with the child is also against the weight of the evidence and contrary to this Court's prior holding that abandonment cannot be proven unless a parent has access to the child. G.M.T., 965 S.W.2d at 203. The evidence of Mother's deception, unreliability and elusiveness, and the ongoing juvenile case coupled with the juvenile authorities' resistance during the statutory *803 period,[8] constituted good cause for D.G.P.'s inability to arrange for communication and visitation with C.J.G.
The trial court granted C.J.G.'s adoption on the same abandonment grounds as the termination of parental rights. We reverse the judgment of termination and adoption, as neither is supported by clear, cogent and convincing evidence that D.G.P. willfully abandoned the child. Our reversal and remand requires the juvenile court to re-assume jurisdiction over C.J.G. and allows the Juvenile Officer or Adoptive Parents to take further action consistent with §§ 211.447, 453.030 and 453.040.
In remanding the case, we note that D.G.P. raises another point on appeal that may be at issue in subsequent proceedings. D.G.P. contends, in Points I and II, that the trial court erred in refusing to grant his request for blood testing to confirm his paternity and right of consent to the adoption. Adoptive Parents argue the refusal was proper because: 1) the juvenile court did not have jurisdiction to establish paternity; and 2) D.G.P. waived his paternity rights by failing to register as a putative father within 15 days of the child's birth, pursuant to § 192.016, and by failing to establish a relationship with the child.
We find no support for these arguments. D.G.P. did not petition the juvenile court to declare his paternity,[9] he merely requested a blood test to obtain evidence proving his right to consent to the adoption. Despite limited jurisdiction, the juvenile court has authority to order such testing that may be of evidentiary value in termination or adoption proceedings. See In the Interest of B.B.B., 905 S.W.2d 118, 120 (Mo.App. W.D.1995).
We are also unpersuaded that any waiver arose to bar D.G.P. from paternity testing. As discussed, supra, Mother initially deceived D.G.P. about his paternity; thus, he had no reason to file with the putative father registry within fifteen days of C.J.G.'s birth. In any event, D.G.P.'s failure to follow the registry procedure does not extinguish his option to later assert paternity. Non-compliance with the registry is a fact the court could consider in exercising its discretion as to whether to order blood testing. Similarly, the court should have considered Mother's concealment and subsequent placement of the child under the court's jurisdiction, factors which denied D.G.P. an opportunity establish a relationship with C.J.G.
The trial court's reason for denial of the blood testing is unclear, as it entered a summary order. We need not determine whether the denial was error because the judgment is reversed on other grounds and the termination/adoption will proceed only upon new application by the Juvenile Officer or Adoptive Parents. We caution, however, that D.G.P. should be reasonably permitted to obtain and present evidence that will allow him to defend against a termination of his parental rights and the adoption of his child. Finally, we note, based on another allegation of error in Point III, that any future judicial decisions regarding the termination of D.G.P.'s parental *804 rights must include a finding of the child's best interests.
The judgment of the trial court is reversed, and the case is remanded for further proceedings consistent with this opinion.
All concur.
NOTES
[1] We review the facts and all reasonable inferences therefrom in the light most favorable to the trial court's judgment. In the Interest of Z.H., 5 S.W.3d 567, 569 (Mo.App. W.D.1999).
[2] D.G.P. was scheduled for parole release in late March 2001, two weeks after the hearing. The record indicates he was actually released sometime prior to filing this appeal.
[3] Consistent with § 211.447.4(1), the trial court made specific findings that D.G.P. willfully abandoned his child for six months preceding the petition filing. However, the court incorrectly cited § 211.447.2(2), which allows termination of parental rights when a child under one year of age has been abandoned for sixty days. We decline D.G.P.'s invitation to reverse upon this citation error, as the factual findings clearly indicate that § 211.447.4(1) was the statutory basis for the court's ruling.
[4] All statutory references are to RSMo 2000, unless otherwise noted.
[5] Although the court made no specific findings on witness credibility, we must view the evidence in a light most favorable to the judgment and presume the trial court disbelieved D.G.P. to the extent, if any, that his testimony conflicted with that of other witnesses.
[6] Mother consented to the adoption and did not testify at the termination hearing.
[7] While the additional discrepancies are minor, they enhance our conclusion that the trial evidence was not carefully considered in rendering judgment. For example, the court found that D.G.P. first learned in May 2000 that C.J.G. was in DFS custody. The only evidence in the record on this issue came from D.G.P., who testified that Mother advised him of the DFS custody by letter dated May 31, 2000. D.G.P. could not have received that letter by mail until sometime in June 2000. Thus, the court's finding is unsupported by the record.
[8] In reaching this conclusion, we do not hold that the juvenile authorities were mandated to notify D.G.P., as a putative father, at the earliest opportunity in the juvenile case and offer him supportive services through DFS. Our holding focuses on the efforts D.G.P. made to demonstrate his intent not to abandon the child, as confirmed by the testimony of the juvenile authorities. We conclude that the juvenile authorities were resistant to D.G.P.'s efforts, thereby precluding his access to the child.
[9] D.G.P. sought a declaration of paternity in a separate lawsuit that was not filed in juvenile court. t.