

# In the
# Missouri Court of Appeals
## Western District

| | |
|---|---|
| IN THE INTEREST OF: G.E.R.; | ) |
| JUVENILE OFFICER, | ) |
| | )   **WD77128** |
| Respondent, | ) |
| | )   **OPINION FILED: September 9, 2014** |
| v. | ) |
| | ) |
| B.R. (FATHER), | ) |
| | ) |
| Appellant. | ) |

**Appeal from the Circuit Court of Cass County, Missouri**
The Honorable Meryl L. Lange, Judge

Before Division Three: Gary D. Witt, Presiding Judge, Joseph M. Ellis, Judge and
Thomas H. Newton, Judge

B.R. ("Father") appeals from the trial court's judgment terminating his parental rights in his minor child, G.E.R., based on abandonment. Father argues on appeal that (1) the trial court erred in finding he had voluntarily and intentionally abandoned his child in that there was insufficient evidence of a clear, cogent, and convincing nature, and (2) the trial court erred in finding it was in the child's best interest to terminate Father's parental rights because there was evidence favorable to him based on the factors under Section 211.447.7.[1] We reverse the trial court's judgment terminating Father's parental rights, as

---

[1] All statutory references are to RSMo 2000 as currently supplemented unless otherwise indicated.

the record does not support a finding of voluntary and intentional abandonment sufficient to support termination. Because Point I is dispositive, we need not address Father's second point. The termination of Mother's parental rights has not been raised on appeal, and the trial court's judgment in that respect is affirmed.

## FACTS AND PROCEDURAL HISTORY[2]

T.R.F. ("Mother") gave birth to G.E.R. on April 6, 2009. When G.E.R. was born, she tested positive for marijuana and exposure to methamphetamine. On April 8, 2009, the Children's Division ("Division")[3] took jurisdiction over G.E.R. and was granted temporary protective custody. On June 2, 2009, the court entered an order placing G.E.R. in the legal custody of the Division.

Mother did not list a father on the birth certificate, but she contacted Father's mother to indicate the child might be her grandchild. Father went to the hospital to see her, but Mother had a hospital order that prevented any visitors from seeing the child. She led Father to believe he would be able to visit the child the next day.

When Father attempted to contact Mother the day after the birth, Mother had already checked out of the hospital. Father contacted Mother's family and friends, but was repeatedly told by each that the child was "with an aunt," not present at that time, was at the lake with grandparents, was in the car with Mother, or other information regarding the child's whereabouts, none of which turned out to be true. Mother concealed the child's whereabouts from Father but always maintained that she had the child in her

---

[2] We review the facts in the light most favorable to the trial court's judgment. *In the Interest of B.J.H.*, 356 S.W.3d 816, 820, n.1 (Mo. App. W.D. 2012) (citation omitted).

[3] The Children's Division has handled all aspects of G.E.R.'s legal proceedings and legal custody since the child was removed from Mother's custody shortly after her birth.

custody. Father asked Mother's family whether they needed financial assistance for the child and was told that they did not. There is no evidence at any point during the first eight months of G.E.R.'s life that Father was aware that G.E.R. was in the custody of the Division.

In 2006, Father was arrested for distribution with intent to manufacture or produce methamphetamine, possession with intent, and second-degree assault and was placed on probation.[4] On November 13, 2009, approximately six months after the child's birth, Father was incarcerated at the Lafayette County Jail on a probation violation for felony eluding.[5] Father was transferred from the Lafayette County Jail to the Missouri Department of Corrections ("DOC") on December 18, 2009. Father was thereafter incarcerated in DOC for three years until his release in December of 2012.

The only evidence presented at trial regarding the events prior to his incarceration was Father's uncontroverted testimony. During this period, Father believed that Mother or her family had G.E.R. and that Mother refused to accept Father's offers and attempts to provide financial support. Father was unaware of the putative father registry. Father did not assert his legal rights during this time period or contact an attorney regarding the matter. Because he was unaware that the Division had taken the child at birth, Father "never had any reason to obtain a birth certificate. [He] thought [his] child was with its mother and that it was safe."

---

[4] Father completed a four-month drug treatment program while in the Department of Corrections.
[5] Father was found not guilty of felony eluding, though he was found to have violated his probation as a result of this arrest.

Father testified that, during his incarceration in county jail in 2009, communication was limited, and he was not able to attempt to contact Mother. However, once Father was transferred to the DOC, Father attempted to contact Mother once a month until he was successful in 2011. Approximately every three months, Father also requested that his mother try to locate Mother and G.E.R., and he requested that she drive by the house where Mother indicated G.E.R. was staying to see whether G.E.R. was receiving proper care. During the subsequent interactions between Father and Mother, Mother gave him reason to believe that she was ready and willing to have Father build a relationship with G.E.R. upon his release. Father testified that he told Mother that he wanted to have a relationship with his daughter and "to make sure she has the things she wants in life." Father offered to send money while he was in prison, but it was still refused by Mother.[6] Even when Father offered to send a check at Christmas for G.E.R., Mother told him to keep the money "where he needed it in there."

Mother originally informed the Division that another man ("L.H.") was the putative father of G.E.R. A court report dated May 15, 2009 listed L.H. as the putative father. A court report dated November 14, 2009 listed the father as unknown. The November 14, 2009 court report indicated that paternity testing conclusively established that L.H. was not the father of G.E.R.

A March 2, 2010 court report from the Division listed Father as the putative father but used an incorrect spelling of Father's first name. Conversely, the next two reports once again listed L.H. as the putative father, even though the Division had the paternity

_____

[6] Father earned $250 to $300 per month while incarcerated.

report indicating that L.H. was conclusively not the father. The next report once again incorrectly spelled Father's first name. Finally, the October 18, 2012 report correctly listed Father as the putative father of G.E.R. with the correct spelling of his name. The Division's efforts to locate Father finally began in the spring of 2012, but the first attempts once again used the incorrect spelling of Father's first name. The search did yield one possibility for a match in DOC that stated "possible match currently incarcerated." No further efforts were made by the Division to determine whether the "possible match" was, in fact, Father.

Finally, in October, 2012, when G.E.R. was three and a half years old, Mother admitted to Father during a phone conversation that she had been lying the whole time regarding the whereabouts of G.E.R. Mother finally informed him that G.E.R. was in the Division's custody and that it was taking her parental rights away. At this point, Father asked his mother to contact the Division, which responded to him with an "incarcerated parent" letter. Upon Father's release that December, the legal process between Father and the Division began, starting with a paternity test, which conclusively established Father's paternity.

After the paternity test, Father became engaged in services from the Division. Father completed a six-month inpatient therapeutic drug treatment program while he was incarcerated and had a written service agreement with the Division for steps he was to complete following his release. Father also participated in outpatient substance treatment. The agreement with the Division required Father to have a psychological evaluation, a drug-and-alcohol assessment, a parenting assessment, and to see an

individual therapist. Katie Hillen ("Hillen"), the Division's employee assigned to G.E.R.'s case, testified that efforts to obtain documentation regarding Father's completion had been difficult for both Hillen and Father, as Father's parole officer had not been cooperative, and many of the services Father was receiving were also a part of his parole. The only requirement of the agreement that Father had not met before the termination hearing was providing written proof of employment through pay stubs or any other method. Father testified that he is employed as head mechanic and in charge of parts sales at Ace Auto. Hillen stated there was no reason not to believe Father's testimony that he had been employed at the same business for eight and a half months, earning $1200 per month.

Christina Lenon ("Lenon"), a professional counselor, conducted a bonding assessment between Father and G.E.R.[7] Lenon concluded that there was no psychobiological bond[8] between the two but she did see a rapport developing. Lenon was surprised that the rapport was built at all because (based on Lenon's recommendation) G.E.R. was not informed who Father was or why she was visiting with him.

Following the bonding assessment, Father and G.E.R. had six supervised visits between August 21, 2013 and October 29, 2013. Father attended every visit. No one informed G.E.R. that these supervised visits were with her biological father. Reports

---

[7] Following his release from prison, the Division denied Father any sight or sound contact with G.E.R. until it was ordered by the court. A bonding assessment was completed by the Division prior to authorizing supervised visits.

[8] Lenon described a psychobiological bond as "imprinting that a human or an animal would experience toward birth with a parent."

show that at first G.E.R. was hesitant and at times was crying and hiding behind the supervisor. By the last visit, G.E.R. appeared to enjoy all activities with Father, who would bring puzzles, toys, and clothes for the child to these visits. Further, Father made four $50 support payments during this period.

Father resides with his mother and her husband, and Father pays them rent. Father testified that he will reside there until he is able to support both himself and G.E.R. Father states that he is committed to continuing therapy appointments and other steps to show improvement, while maintaining support at home until he can show greater independence.

In May, 2013, psychologist William McDonnell ("McDonnell") evaluated Father. He diagnosed Father with antisocial personality disorder.[9] McDonnell believed that, while not necessarily putting a child at higher risk, this sort of personality disorder makes one resistant to change, more likely to relapse into drug abuse, and subject to a greater possibility of reincarceration. McDonnell believed treating the disorder is very possible for one who is highly motivated, but it would take a lengthy amount of time before the risk of relapse would be greatly diminished. Thus, McDonnell believed that until there was extended treatment, any child would be at a greater risk of neglect.

Father's individual therapist, Lenon, disagreed with the diagnosis of antisocial personality disorder. Lenon stated that the disorder is consistent with those who do not have a "moral center." Lenon stated that Father shows an understanding of right and

---

[9] The diagnosis was based on Father having a history of illegal activities and substance abuse. The criteria for the disorder usually includes: history of violating rules, resentment of authority, resistance to authority, willingness to harm others, and pleasure orientation.

7

wrong and is taking steps to live an appropriate lifestyle. Lenon suggested that a parent safety course and continued displays of living independently would show that Father is ready to assume custody of G.E.R.

The Petition to Terminate Parental Rights was filed on October 14, 2011. Summons was not served on Father until November 26, 2012. One year later, on November 22, 2013, following a hearing, the court entered an order terminating all of Father's parental rights over G.E.R.[10] The basis for this order was that the court determined that Father, pursuant to Section 211.447.5(1), abandoned G.E.R. for a period longer that six months and, without good cause, left the child without any provisions for parental support and without making arrangements to visit or communicate with the child although able to do so. Further, the court found that it was in the best interests of G.E.R., pursuant to Sections 211.447.6 and 211.447.7, that Father's parental rights be terminated because there were no emotional ties, Father had not maintained regular visitation or other contact, Father did not financially provide support for the child although able to do so, additional services would not bring lasting parental adjustment, and Father had demonstrated a disinterest in and lack of commitment to the child until more than three years after birth. The court declared that G.E.R. shall remain in the custody of the Division until further order.

**STANDARD OF REVIEW**

Our review of this decision is in accordance with *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976). The trial court's judgment will be affirmed unless there is no

---

[10] The judgment also terminated all parental rights of Mother, who is not a party to this appeal.

8

substantial evidence to support it, it is against the weight of the evidence, or it erroneously declares or applies the law. *In re Adoption of C.M.B.R.*, 332 S.W.3d 793, 815 (Mo. banc 2011) (citation omitted). The judgment will be reversed only if this court is left with a firm belief that the order is wrong. *Id.* Evidence is reviewed in light most favorable to the trial court's decision, and this court defers to the trial court's credibility determinations. *Id.* The same standard of review applies in all types of court-tried cases regardless of the burden of proof at trial. *Ivie v. Smith,* No. SC93872, 2014 WL 4065092, at *13 (Mo. banc July 8, 2014). However, the termination of parental rights is an exercise of awesome power and strict and literal compliance with the statutory language is demanded. *In re Baby Girl W.*, 728 S.W.2d 545, 547 (Mo. App. W.D. 1987). "The party seeking to invoke the statute must carry the full burden of proof." *Id.* (citation omitted).

## ANALYSIS

The only ground upon which the trial court granted the termination of Father's parental rights was based on a finding of "abandonment" pursuant to Section 211.447.5(1)(b). This section provides that parental rights may be terminated if a parent has abandoned a child, who was over one year of age at the time of the filing of the petition, for a period of six months or longer. The statute defines abandonment as: "The parent has, without good cause, left the child without any provision for parental support and without making arrangements to visit or communicate with the child, although able to do so." § 211.447.5(1)(b).

9

When terminating parental rights, the trial court uses a two-step analysis. *In re G.T.M.*, 360 S.W.3d 318, 319 (Mo. App. S.D. 2012) (citing *In re B.H.*, 348 S.W.3d 770, 776 (Mo. banc 2011)). The first step, the subject of Point I, is for the court to determine whether there is clear, cogent, and convincing evidence that one or more of the statutory grounds for termination is present, pursuant to Section 211.447.6. *Id*. at 320. The standard of clear, cogent, and convincing evidence is met when the evidence "instantly tilts the scales in the affirmative when weighed against the evidence in opposition and the fact finder's mind is left with an abiding conviction that the evidence is true." *In re C.M.B.R.,* 332 S.W.3d at 815 (citation omitted).

If we determine the trial court was correct in that one or more statutory grounds for termination of parental rights is proven, the court then must determine whether the termination is in the best interest of the child. *Id*. at 815-16. The trial court determines best interest under a preponderance of the evidence standard. *Id*. at 816. On appeal, we review the determination for abuse of discretion. *Id*. As noted above, we do not reach this second step, the subject of Father's Point II.

Abandonment is the *voluntary and intentional* relinquishment of child custody, with the intention of permanently severing the rights of a parent or of severing the duties of a parent; or, abandonment is the parent's intentional withholding, without just cause or excuse, of his presence, care, love, and protection. *In re G.T.M.*, 360 S.W.3d at 322 (citations omitted). Thus, the issue of abandonment is largely focused on the parent's intent, in which evidence can be considered from before and after the six-month statutory period. *Id*.

On appeal, Father argues that there is insufficient evidence to support a finding that he had the requisite mental state to voluntarily and intentionally relinquish his custody of G.E.R. or that he intentionally failed to contact the child and to provide support. Father's first Point Relied On makes clear that his challenge is that there was "insufficient evidence" to support the trial court's judgment in this regard and not a challenge that the decision was "against the weight of the evidence." *See In re J.A.R.,* 426 S.W.3d 624, 629-630 (Mo. banc 2014). A challenge of "insufficient evidence" requires Father to demonstrate that there was no substantial evidence to support the trial court's decision as opposed to a challenge that the trial court's judgment was "against the weight of the evidence" which presupposes that there is sufficient evidence to support the judgment. *Id.*

Father argues that the uncontroverted evidence establishes that he was unaware that G.E.R was placed in foster care two days after her birth and subsequently in the legal custody of the Division. Father further argues that Mother and her family deceived him as to where G.E.R. was and that she had been removed from Mother's care, consistently lying to Father as to the whereabouts and custody of G.E.R. Father argues his efforts "in making arrangements to visit or communicate with the child," pursuant to Section 211.447.5(1)(b), were frustrated by this resistance and deception of Mother. Finally, Father argues that he did not leave the child "without any provision for parental support" as offers to provide support were repeatedly refused by Mother's family, who informed him they did not need anything from him. Accordingly, Father argues that the "without good cause" provision from Section 211.447.5(1)(b) is not met.

11

In its judgment, the trial court made the following factual findings to support the determination of abandonment: (1) Father's first visit with the child was not until August, 2013, even though he believed that the child was his at the time of her birth; (2) Father made no effort to assert his paternity until December, 2012; (3) Father had not provided any parental support since the child's birth; (4) Father had only provided $150 to the foster parents and provided the child some clothing and toys beginning in August, 2013, even though the paternity test was completed in January, 2013, and Father was gainfully employed.

In short, Father argues that because Mother actively concealed the whereabouts of G.E.R, there was insufficient evidence to show his intent to relinquish his parental rights. After a review of the jurisprudence and the record, we agree that there is insufficient evidence to support a finding that Father abandoned G.E.R.

In *In re Baby Girl W.*, the mother informed the father she was pregnant but did not want to marry him. 728 S.W.2d 545, 546 (Mo. App. W.D. 1987). To avoid the father trying to see the child, the mother told him she was moving to California prior to the child's birth. *Id*. The mother concealed her whereabouts from the father and further concealed that she had placed the child for adoption. *Id*. at 547. At trial, father's parental rights were terminated due to abandonment, although he challenged this finding in the adoption proceedings. *Id*. On appeal, the judgment was reversed due to insufficient evidence that the father had a "settled purpose to abandon the child." *Id*. at 548-49. We noted that the father had no knowledge of where the mother was during the prenatal period, was not informed of the birth, nor of the adoption, and was not given any means

12

to discover these facts. *Id.* at 549. "In sum, the proof adduced by the juvenile officer failed to establish that appellant knew or had the means of knowing that his child had been born or even where the child had been placed, thereby effectively precluding any possibility for appellant to make any contact with the child." *Id.* at 548.

Similarly, in *In re G.M.T.*, the father was unaware of his child being placed for adoption, which led to proceedings to terminate his parental rights on the basis of abandonment. 965 S.W.2d 200, 201 (Mo. App. E.D. 1998). There, the mother and father were living together and in a relationship when the mother became pregnant with their child. *Id.* at 201. The mother moved out of the house, intent on not being found by the father and began attempting to make arrangements to place the unborn child with a relative for adoption. *Id.* After adoption, the father and mother renewed relations and attempted to regain parental rights. *Id.* The father contended that one cannot be subjected to termination of parental rights unless one had knowledge of the birth and knowledge of mother or child's location. *Id.* at 203. The Eastern District agreed, ruling that there was no evidence that the father knew where the mother was and, thus, could not have agreed to abandon his child and give the child up for adoption. *Id.*

Further, in *In re C.J.G.*, 75 S.W.3d 794 (Mo. App. W.D. 2002), the mother gave birth to a child and listed multiple possibilities for the putative father, none of whom were given notice when the juvenile case commenced. *Id.* at 795. The father had believed he was the biological father up until two weeks before the birth. *Id.* at 799. At that point, the mother deceived the father into thinking someone else was the father. *Id.* The father took no action to assert his parental rights until the mother contacted the father, who was

13

then in prison, notifying him that the child was actually his. *Id*. The father wanted to interact with the child and was told they could become a family upon his release. *Id*. Contact began again three months later when the mother informed the incarcerated father that she had lost custody of the child, who was placed in foster care. *Id*. at 800. Father's parental rights were terminated soon thereafter. *Id*. On appeal, we reversed, finding that throughout the entire time of the alleged abandonment, the whereabouts of the child were either concealed by the mother or the child was in custody of family services. *Id*. at 801-04.

In the case at bar, the judgment is not supported by sufficient evidence because (1) Mother actively concealed child's whereabouts for three and a half years, (2) Father was not "able" to make "arrangements to visit or communicate with the child," pursuant to Section 211.447.5(1)(b), and (3) Father attempted to make "provision for parental support," under Section 211.447.5(1)(b). Additionally, the Juvenile Officer's argument that Father abandoned G.E.R. due to his lack of efforts to take legal action from the start is without merit.

To be "without good cause," pursuant to Section 211.447.5(1)(b) and *In re G.M.T.*, a finding of abandonment is not warranted where a parent has been deceived about his or her child's whereabouts. 965 S.W.2d at 203. Moreover, "[t]o prove abandonment, there must be evidence which shows accessibility of the child for purposes of visitation and communication." *Id*. Here, Father held the belief that G.E.R. was safe and was cared for by Mother and her family. There was no allegation or evidence that this belief was unreasonable. When a parent is deceived and the child's whereabouts are concealed, the

14

statutory ground of abandonment is hardly compatible with a voluntary relinquishment of custody. *Id.* Father's persistent phone calls while incarcerated, along with his efforts to find Mother and G.E.R. before his imprisonment, show that Father's efforts were frustrated by Mother and her family's deception. Father held a belief for the first three and a half years of G.E.R.'s life that Mother was going to allow him to form a relationship with his child.

As in *In re C.J.G.*, Mother waited until Father was incarcerated to provide him information regarding the whereabouts of the child. There was no evidence that the long delay before contact was due to Father's lack of desire to locate his child and be a part of her life. Further, there was no evidence that Father's lack of parental support was due to any factors other than deception, concealment and Mother's blatant refusal to accept the offered support.

Additionally, the evidence established that Father was not "able" to make "arrangements to visit or communicate with the child," under Section 211.447.5(1)(b). Father's efforts continually were frustrated by the dishonesty and concealment by Mother, in collusion with her family and friends, and subsequently frustrated by his incarceration.[11] Once Father knew that G.E.R. was in custody of the Division, he took the steps necessary to begin the supervised visits and complied with all of the conditions placed upon him by the Division to establish contact with G.E.R., with the minor

---

[11] Section 211.447.7(6) expressly states that "incarceration in and of itself shall not be grounds for termination of parental rights."

15

exception of failing to provide the Division with written proof of his employment and wages.

Additionally, the trial court's judgment is unsupported by the record because there is no evidence that Father willfully intended to leave his child "without any provision for parental support" pursuant to § 211.447.5(1)(b). In *In re G.M.T.*, we determined that the father, unaware his child had been put up for adoption, could not have willfully abandoned his child and permanently given up parental support. Similarly, here Father was unaware of the child not being in the care or safety of the person with whom he had been in communication. He was told that G.E.R. was safe and was with family. Father requested that his own mother drive by the grandparents' house to see whether she could provide him some assurance that his child was being properly cared for. The efforts by Father increased dramatically when he was finally informed that G.E.R. was in legal custody of the Division. There is no evidence to establish that Father's lack of parental support was due to anything other than the complete rejection of his offers of support on the part of Mother.

Finally, the Division argues that Father should have proceeded to file an action in paternity as soon as he discovered the child might be his. However, the law should encourage cooperation in the delicate matter of two unmarried parents attempting to work out parenting and support issues regarding their child rather than mandating that the parties immediately resort to the adversarial process of the court system.[12]  Mother

---

[12] *See generally In re N.L.B.*, 212 S.W.3d 123 (Mo. banc 2007) (holding that Father who failed to file with the putative father registry was not precluded from challenging adoption and termination of parental rights under statutory scheme for adoptions).

16

continually dangled out hope that she and Father would be able to work out these parenting issues and that Father would be allowed to participate in the raising of his child. We refuse to hold as a matter of law that under these facts, Father's failure to immediately invoke the jurisdiction of the courts amounted to an intentional relinquishment of his parental rights. While a trial court may consider a parent's failure to exercise parental rights in considering abandonment under the statute, under the facts of this case it is inappropriate to base a finding of abandonment on the failure to race to the courthouse to file a paternity action.

Similar to *In re C.J.G.*, Father, while incarcerated, was hoping a relationship with the child was going to be formed upon his release. Similarly, this hope was dispelled when Mother admitted her concealment and that his child was in the custody of the Division.[13] From the time of learning of Mother's deceit, Father contacted the Division. Father followed the directives of the Division and made all reasonable efforts allowed by the Division to establish his relationship with G.E.R.

In short, the record simply does not establish a willful positive act by Father showing his intent to voluntarily relinquish his custody with the intent to never again claim the rights or duties of a parent to this child. *Id.* at 801.

## CONCLUSION

After reviewing the record, we conclude that the finding of abandonment is not supported by the record. Accordingly, the part of the judgment that terminates Father's

---

[13] There is no indication that Father and Mother were colluding to frustrate the termination of either Mother's or Father's parental rights.

17

parental rights to G.E.R. is reversed; the portion of the judgment terminating Mother's parental rights is affirmed. The reversal of the judgment does not automatically transfer physical custody of G.E.R. to Father. This reversal is limited to a determination that there is insufficient evidence for a finding of intentional abandonment by Father. The physical custody of G.E.R. shall remain with Division to facilitate the reunification. Father's visitation shall be prescribed by the trial court, which retains jurisdiction over the child. Nothing in this opinion shall prohibit the future termination of Father's parental rights should future acts by Father justify such termination.

_____

Gary D. Witt, Judge

All concur