IN the INTEREST OF C.L.W.,
A Minor Child.

B.A.W.(T), Appellant,

v.

State of Missouri, Greene County
Juvenile Office, Respondent.

No. 25319.

Missouri Court of Appeals,
Southern District,
Division Two.

July 28, 2003.

Application for Transfer Denied
Aug. 6, 2003.

Christopher A. Hazelrigg, Hazelrigg, Roberts & Easley, P.C., for appellant.

Bill Prince, Springfield, for respondent.

KENNETH W. SHRUM, Judge.

B.A.W.(T.) ("Mother") appeals from a judgment which terminated her parental rights to C.L.W., her daughter.[1] Mother alleges there was insufficient evidence presented to support the trial court's finding that two termination grounds were proven by clear, cogent, and convincing evidence. She also claims the court erred in finding that termination of her parental rights would serve the best interests of C.L.W. The court found Mother had neglected C.L.W. (§ 211.447.4(2)) and the child had been under the jurisdiction of the juvenile court for one year without Mother rectifying the conditions leading to the court's assumption of jurisdiction (§ 211.447.4(3)).[2] The court then determined that termination was in C.L.W.'s best interests. Because the neglect ground was proven by

clear, cogent, and convincing evidence and the child's best interests would be served by terminating Mother's parental rights, we affirm the judgment of the trial court.

## STANDARD OF REVIEW AND STATUTORY PROVISIONS

■ A trial court's decision to terminate parental rights is reviewed under the well-known standards of *Murphy v. Carron*, 536 S.W.2d 30 (Mo.banc 1976). *In re S.L.J.*, 3 S.W.3d 902, 907 (Mo.App.1999). Thus, we will affirm the judgment unless there is no substantial evidence to support it, unless it is against the weight of the evidence, or unless it erroneously declares or applies the law. *Id.* When conflicting evidence is presented, the facts and reasonable inferences are viewed in the light most favorable to the judgment with due regard given to the trial court's determination of witness credibility. *In re A.R.*, 52 S.W.3d 625, 633 (Mo.App.2001); *S.L.J.*, 3 S.W.3d at 907. We must also bear in mind the juvenile court is free to believe all, part, or none of a witness's testimony. *Id.*

■ A juvenile court has the statutory authority to terminate a parent-child relationship "if the court finds that the termination is in the best interest of the child and when it appears by clear, cogent and convincing evidence that grounds exist for termination pursuant to subsection 2, 3, or 4 of [§ 211.447]." Section 211.447.5; *In re J.M.*, 1 S.W.3d 599 (Mo.App.1999). The clear, cogent, and convincing standard is met when the evidence instantly tilts the scales in the affirmative when weighed against the evidence in opposition, and the fact-finder's mind is left with an abiding

1. In the same judgment, the lower court terminated the parental rights of C.L.W.'s biological father. The father failed to appeal; consequently, this part of the judgment is

final. *In re J.L.F.*, 99 S.W.3d 15, 16 n. 1 (Mo.App.2003).

2. All statutory references are to RSMo (2000), unless otherwise indicated.

conviction that the evidence is true. *In re C.M.B.*, 55 S.W.3d 889, 893 (Mo.App.2001).

■ Even though a trial court finds multiple statutory grounds exist for termination of parental rights, an appellate court does not have to decide if sufficient evidence supports each finding. We can affirm if any one ground thus found is supported by evidence that meets the clear, cogent, and convincing standard. *In re J.K.*, 38 S.W.3d 495, 499 (Mo.App.2001). In such an instance, we need not reach the merits of the other grounds found by the trial court. *Id.*

A juvenile officer or the Division of Family Services may file a petition to terminate parental rights when it appears a "child has been abused or neglected." § 211.447.4(2). The abuse or neglect ground for termination contains statutory subparagraphs that are factors a court "shall consider and make findings on" when adjudicating a termination of parental rights case. § 211.447.4(2); *In the Interest of J.N.C.*, 913 S.W.2d 376, 379 (Mo. App.1996). However, the subparagraph (a-d) factors under section 211.447.4(2) "are not independent grounds for termination, but merely categories of evidence to be considered together with all other relevant evidence."[3] *Id.*

## FACTS

■ This court is to view the evidence in the light most favorable to the juvenile court's judgment. *S.L.J.*, 3 S.W.3d at 907. With that principle as a guide, the following are the relevant facts.

C.L.W. was born on November 1, 2000, and on the next day, a "newborn crisis assessment" alleged that Mother used marijuana during the pregnancy, she had no permanent home, she was a juvenile runaway, and she had no necessities for C.L.W.'s care. A child abuse and neglect investigator, Angela Atwell, for the Division of Family Services ("DFS") contacted Mother at the hospital who confirmed she had no necessities for C.L.W., had no permanent home, and was a runaway. During these interviews, Mother stated she lived "on and off" with C.L.W.'s father. The father, however, had "three substantiated sexual abuse hotlines" that ranged from "fondling/touching to intercourse." Mother also confessed that she had been at a party two weeks prior to the birth where marijuana was being smoked.

C.L.W. was placed in the temporary custody of DFS because Mother "is a minor, no clothes or necessities for the baby have been obtained, and lastly [there is] no place for [Mother] and the baby to live." In December 2000, a psychological evaluation was conducted that characterized Mother as "manipulative," i.e., "[s]he has been successful at getting others to feel sorry for her, to give her transportation, a place to live, some help, some money, etc." The evaluation further revealed that Mother was "resistant" and saw "no reason to change;" therefore, the prognosis for C.L.W.'s return was "questionable."

A treatment plan was ordered by the court, which Mother generally followed until July 2001. The notable exceptions included the following: (1) Mother tested positive for drug use in June 2001; (2) Mother lived with various friends and family members throughout the case; (3) Mother was arrested in March 2001; and

---

**3.** In its brief, the juvenile office requests this court to hold that a termination of parental rights, based upon the abuse or neglect ground, can be upheld solely on the fact that a finding has previously been made that the child was "adjudicated" abused or neglected. That question has been answered adversely to the juvenile office in *J.L.F.*, 99 S.W.3d at 19 n. 3, and *In re B.C.K.*, 103 S.W.3d 319, 328 (Mo.App.2003).

(4) Mother did not inform DFS of changes until after they occurred.

In July 2001, Mother moved to New Mexico, leaving her child behind in the state of Missouri. Mother told a counselor in New Mexico "that she left Missouri because living with her dad was hindering her from meeting her treatment goals." She told her caseworker, Stephanie Ash, that she voluntarily moved "because she could be with her mother down there." At trial, Mother claimed that her mother forced her to move to New Mexico.

Until the end of October (approximately four months), Mother had no contact with DFS, and, needless to say, no contact with her child. After an hour-long visit in October, Mother had no contact with her child through, at the very least, February 2002 (approximately four months). No cards, no letters, no photographs, and no phone calls were mailed or made by Mother. Likewise, Mother has never provided financial support for C.L.W. during her young life.

Upon moving to New Mexico, Mother married a man in November 2001 after dating him for three months, separated from him in December 2001, divorced him in May 2002, and gave birth to their child in June 2002. At the time of the hearing, Mother was living in a two-bedroom trailer (paid for by the state), did not work, and planned to attend college, but was not enrolled. Mother failed to complete alcohol and chemical treatment classes in New Mexico. She did receive her GED and regularly attended other counseling programs. With one exception, Mother's "improvements" occurred after the termination petition was filed.

The petition to terminate Mother's parental rights to C.L.W. was filed on November 29, 2001. A hearing was held on June 25, 2002, and the court issued findings of fact, conclusions of law, and a judg-ment terminating Mother's parental rights on November 12, 2002. This appeal followed.

### Point I: Sufficiency of the evidence of neglect

■ The trial court found clear, cogent, and convincing evidence to support the conclusion that "[C.L.W.] was neglected by the parents." Pursuant to section 211.447.4(2), the court made findings on the statutory subparagraphs heretofore mentioned. The court concluded that only one subparagraph supported the finding of neglect. The judgment reveals the following:

"Repeated or continuous failure by the parent, although physically or financially able, to provide the child with adequate food, clothing, shelter, or education as defined by law, or other care and control necessary for the child's physical, mental, or emotional health and development. The evidence indicated that the parents consistently failed to provide the child with the above required care, custody and control. The evidence presented indicated that neither the mother, the alleged biological father or the unknown biological father provided the child with consistent support or demonstrated the ability to provide the child with the required care, custody and control."

In her first point, Mother alleges that the court erred because no clear, cogent, and convincing evidence was presented to demonstrate neglect. In the argument section of the brief, Mother basically recounts only favorable testimony to declare the evidence was insufficient. Mother points out that she was a minor during the relevant time periods, she allegedly provided some gifts and necessities, she could not provide "child support," and she has improved her life since moving to New

Mexico. Mother's argument is not persuasive.

Although contrary evidence presented might support a different conclusion, this does not necessarily mandate that the court's decision is not supported by clear, cogent, and convincing evidence. *J.L.F.*, 99 S.W.3d at 20. Courts define neglect as the failure to provide, by those responsible for the care, custody, and control of the child, the proper or necessary support, education as required by law, nutrition or medical, surgical, or any other care necessary for the child's well-being. *Id.* at 19–20; *In re J.L.B.*, 9 S.W.3d 30, 35 (Mo.App. 1999). Further, neglect is described as the failure to perform the duty with which a parent is charged by law and conscience. *J.L.F.*, 99 S.W.3d at 20; *In re S.L.N.*, 8 S.W.3d 916, 922 n. 5 (Mo.App.2000). Moreover, "[t]here is an affirmative duty on the part of the parent to show that the parent is committed to the children by showing an interest in them. The parent is required to support, communicate and visit with the children." *D.L. v. D.L.*, 798 S.W.2d 220, 223 (Mo.App.1990); *see also In re A.S.*, 38 S.W.3d 478, 484 (Mo.App. 2001).

Here, the evidence overwhelmingly supports the conclusion that Mother neglected C.L.W. When C.L.W. was born, Mother had no home for the child, nor did she provide any necessities such as clothing. From birth until July 2001, Mother visited C.L.W. for one hour per week, but failed to support the child in any manner.[4] During this time span, Mother followed certain

aspects of her treatment plan, but she maintained no stable environment for the safe return of C.L.W. to her custody, she was arrested, and she tested positive for drugs. These facts, *standing alone*, demonstrate that Mother failed to provide the care necessary for the child's well-being. *J.L.F.*, 99 S.W.3d at 19–20.

Moreover, Mother *voluntarily* moved from the state and left her infant in the care of others. By doing so, Mother revealed her wholehearted disregard for the care, custody, and control of C.L.W. In an *eight-month time frame*, Mother had contact with her daughter for a total of *one hour*. Although Mother testified differently, she did not even *attempt* to contact C.L.W. by letters, phone calls, or cards, and she failed to provide any support such as money or small gifts of affection.[5] Due to Mother's utter disregard for her child, C.L.W. had no recognition that Mother was, in fact, her mother. This is neglect. *See e.g., J.L.F.*, 99 S.W.3d at 20; *A.S.*, 38 S.W.3d at 483–86; *A.H.*, 9 S.W.3d at 59–60; *In the Interest of W.A.H., Jr.*, 725 S.W.2d 150, 155 (Mo.App.1987).

Any improvements that Mother has made in her life have largely occurred after the termination petition was filed.[6] Mother's conduct after the filing of a termination petition cannot constitute the sole consideration of the court's decision. *In re N.M.J.*, 24 S.W.3d 771, 780 (Mo.App.2000). A court must look at the totality of a parent's conduct both prior to and after the filing of the termination petition. *Id.* "Otherwise, a parent can always argue

---

4. "Although the DFS did not demand that mother support her child, a parent's duty to support the parent's child does not abate while the child is in the custody of DFS." *In re A.H.*, 9 S.W.3d 56, 60 (Mo.App.2000).

5. Although unemployed, Mother testified she intended to work part-time. Because she chose not to work, her claims that she could

not provide support to her daughter ring hollow. More than that, she had enough income, albeit from the state, to maintain her own home and provide for her second child.

6. While we applaud her recent efforts, we cannot ignore the entirety of her conduct during C.L.W.'s life.

that she [or he] has reformed since the filing of the petition, reformation usually occurring while the child is away." *In the Interest of J.M.L.*, 917 S.W.2d 193, 196 (Mo.App.1996). For these reasons, a parent's conduct after the termination petition has been filed may not be compelling. *N.M.J.*, 24 S.W.3d at 780.

These principles are especially true when, as here, Mother exhibited behaviors, after the termination petition was filed, demonstrating she has not changed. As an example, Mother was married to a man she dated for three months and separated a month after the union. As her treatment plan recognized, children need stability. By focusing solely on her own selfish desires, Mother cannot provide that stability. This lack of stability is further evidence that Mother has neglected C.L.W.

We could recount other evidence of neglect, but we refrain. The above recitation amply demonstrates that Mother neglected C.L.W. The juvenile court's finding of neglect is supported by clear, cogent, and convincing evidence. Point denied.

***Point II: Best Interests***

In her second point on appeal, Mother alleges the court erred when it terminated her parental rights because the evidence did not "clearly, cogently, and convincingly" support the court's findings under section 211.447.6. Once again, Mother largely recounts only evidence favorable to her position.

Section 211.447.6 reveals that a court, when deciding termination cases, "shall evaluate and make findings" on certain enumerated factors if appropriate and applicable. Those factors, that the court considered and made findings upon, are as follows: (1) emotional ties between the parent and child; (2) regular visitation or contact with the child; (3) extent of support provided by the parent; (4) whether additional services would bring about a lasting parental adjustment so that the child could be returned to his or her care; and (5) the parent's disinterest in or lack of commitment to the child.[7] § 211.447.6. Contrary to Mother's point relied on, the best interest findings under the statute are reviewed under the abuse of discretion standard. *A.S.*, 38 S.W.3d at 486.

Our recitation of the facts and our discussion under Point I reveal the obvious conclusion we reach here. The testimony indicated that C.L.W. had no emotional ties to Mother. During visits, C.L.W. needed constant reassurances that her foster parents were near as this made her feel secure. More than that, C.L.W. saw Mother as a stranger. This is not surprising considering the fact that, during an eight-month time span of C.L.W.'s early life, Mother had only one hour of contact with C.L.W. Also, even though Mother maintained consistent contact (one hour per week) with C.L.W. from birth to July 2001, she did not do so after that date. A parent has an affirmative duty to show he or she is committed to the child and is required to support, communicate, and visit with his or her child. *A.S.*, 38 S.W.3d at 484; *D.L.*, 798 S.W.2d at 223. Mother has totally failed in this regard.

As to support of C.L.W., we earlier recounted that she has provided nothing for the child throughout her young life. Mother testified she did provide support until July 2001. Even if we were to take Mother's testimony at face value, we would still conclude she has failed to support this

---

7. The juvenile court found no emotional ties between C.L.W. and Mother, she failed to consistently visit or contact C.L.W., Mother provided no financial support or gifts, no additional services could be offered, and Mother has shown a total disinterest in and lack of commitment to C.L.W.

child. This follows because Mother testified she provided *no support* for C.L.W. from July 2001 to June 2002. Mother's own testimony indicated the court was correct in finding that she "did not provide in-kind or financial support for the child."

The court also concluded that no services could be offered that would bring about a lasting parental adjustment. From C.L.W.'s birth to July 2001, Mother followed parts of the treatment plan, but several major exceptions clearly prevented the return of C.L.W. to her care. Her living arrangements were unstable, she used drugs, she was arrested, and she did not inform DFS of changes until after they occurred. Then, she voluntarily left the state. She did not contact DFS or her child, except for the October visit. Certainly, she did make improvements after her move, but these came in large part after the termination petition was filed. Moreover, there is no evidence that these changes are lasting adjustments. To the contrary, certain evidence, such as her short-lived marriage, indicates she may be just as unstable as in the past.

Finally, the foregoing demonstrates that Mother has "shown a total disinterest in and lack of commitment to [C.L.W.][.]" Mother's relocation and lack of contact with her child reveal this parental disregard. Even if the lower court found that Mother's move to New Mexico was involuntary, her deplorable conduct, found in her own testimony, in failing to send even a minor gift of affection toward C.L.W., mandates a conclusion that Mother is disinterested in and lacks commitment to her child. By her own testimony, Mother was told by DFS that she could send C.L.W. "anything" if she "wanted to." She *chose* not to.

The trial court did not abuse its discretion when it found that termination of

Mother's parental rights was in C.L.W.'s best interests. Point denied.

The judgment of the juvenile court terminating Mother's parental rights is affirmed.

PREWITT, P.J., dissents in separate opinion.

RAHMEYER, C.J., concurs.

JAMES K. PREWITT, Presiding Judge, dissenting.

I respectfully dissent.

Considering Mother's Point I, I do not feel that there was clear, cogent, and convincing evidence to support either the statutory ground of abuse and neglect or failure to rectify. I will address them in that order.

To terminate parental rights based on abuse and neglect, the trial court must make an affirmative finding on at least one of the factors listed in § 211.447.4(2), RSMo 2000. *B.C.K.*, 103 S.W.3d at 327. As stated in the majority opinion, a mere finding that a child has been previously adjudicated abused and neglected is insufficient to support a termination of parental rights. *Id.* at 328. There must be clear, cogent, and convincing evidence to support the statutory ground.

The trial court found that there had been a repeated or continuous failure by Mother, although she was physically and financially able, to provide C.L.W. with adequate food, clothing, shelter, or education as defined by law, or other care and control necessary for C.L.W.'s physical, mental, or emotional health or development. The trial court also found that although Mother had a history of substance abuse, no evidence was presented that such substance abuse could not be treated. The court found no evidence of a mental condition that would affect Mother's ability

to provide C.L.W. with the necessary care, custody, and control. Nor was there evidence, according to the trial court, of any acts of physical, emotional, or sexual abuse of C.L.W.

C.L.W. was taken into protective custody within a few days of her birth based on an assessment that Mother did not have a permanent home to which to take the baby and did not have adequate clothing and other necessities for the baby. There was also evidence that Mother had tested positive for marijuana a month or so into her pregnancy.

During her pregnancy, Mother testified that she stayed occasionally with the father of the child, but lived primarily with her own father ("Grandfather"). Mother agreed that after C.L.W. was born, and prior to Mother moving to New Mexico, she stayed with various friends and a brother as well as Grandfather.

Mother contended that after she moved to New Mexico, she attempted to call DFS in order to remain in contact with C.L.W., but other than two occasions on which Mother was able to speak to Ash, Mother only left messages, which she claimed were not returned. There was record of one of these conversations with Ash that took place in March 2002 in which Mother "did inquire as to [C.L.W.'s] well being [and] .... also asked if [C.L.W.] needed anything." A letter written by a representative from Teambuilders Counseling Services in New Mexico ("Teambuilders"), which was admitted during the hearing, indicated that Mother had, on several occasions and with assistance of Teambuilders' staff, "made, and/or attempted calls and/or faxes to various entities involved in the custody case of her daughter [C.L.W.] (to include her APO, legal counsel, social workers)."

According to Mother, when she lived in Missouri with Grandfather, it was through an agreement between him and Mother's mother ("Grandmother"), who were divorced. Mother testified that, under the divorce decree, Grandmother had legal custody of Mother and Mother returned to New Mexico to live with Grandmother because Grandfather had not followed through with the conditions of that agreement and Grandmother told Mother that "she had to move back" to New Mexico. Although Mother testified to a conversation with a DFS worker, Donna Reeves, regarding visitation and treatment plans issues should Mother leave Missouri, Reeves did not testify. Ash testified she was aware of Mother's conversation with Reeves, but nothing in the record indicated whether Mother was advised not to move to New Mexico.

Mother testified that she neither received advice that she should not to move to New Mexico nor that she should not live with Grandmother if she did move to New Mexico. Mother contended at the hearing that any information DFS had that Mother was removed from Grandmother's care when Mother was a child was incorrect. According to Mother, there are three other children of Grandmother's that are in California state custody, but that they were put into protective custody by Grandmother following incidents of domestic violence between Grandmother and an ex-husband.

As noted in the majority opinion, Mother now lives in a rented, two-bedroom mobile home in New Mexico and also has a second child. Although at the time of the hearing, she did not have employment and was receiving assistance from the State of New Mexico in the amount of $231 per month, she was not required to pay rent, but did pay for utilities. She also testified to plans to begin college part-time in the fall of 2002 and also work part-time, and anticipated continuing to receive both fi-

nancial and other assistance from the State of New Mexico.

I agree that it is imperative that courts consider the totality of a parent's conduct, both prior to and after the termination petition has been filed. *A.S.*, 38 S.W.3d at 485. Here, C.L.W. was adjudicated abused and neglected based on Mother's alleged conduct prior to and at the time the baby was born. As Atwell testified, for a newborn crisis assessment, "we don't substantiate or unsubstantiate."

Under the circumstances of this case, a decision was made to place C.L.W. in protective custody because it appeared Mother would be unable to provide the child with a permanent, stable home or provide adequate clothing and other necessities. I do not disagree with that decision. However, in my view, the evidence of Mother's conduct since that time, both prior to and subsequent to the filing of the termination petition, does not rise to the level of providing clear, cogent, and convincing evidence to support the finding that there was a repeated or continuous failure by Mother, although physically or financially able, to provide the child with adequate food, clothing, shelter, or education as defined by law, or other care and control necessary for the child's physical, mental, or emotional health and development. Therefore, there was not clear, cogent, and convincing evidence presented to support the statutory ground of abuse and neglect under § 211.447.4(2), RSMo 2000.

Considering the second statutory ground under § 211.447.4(3), RSMo 2000, I believe that there was not clear, cogent, and convincing evidence presented to support it. Regarding substance-abuse preventative training, when Mother was screened for substance-abuse services in November 2000, the evaluator determined no services were needed. A mental health counselor in New Mexico conducted a drug and alcohol use assessment on Mother in March 2002 on which Mother placed at a Level 0, indicating that no further interventions were required.

In addition to a parenting class Mother completed in Missouri, she also sought family support services in New Mexico through Teambuilders, which admitted her into its program in July 2001. A Teambuilders' representative also conducted a home and child safety check to address potential needs of both Mother's second child and C.L.W. Teambuilders found that Mother had been and was currently participating in its services and "consistently expressed concern and positive interest for her daughter [C.L.W.], for whom she has been working towards stabling an independent home environment . . . in New Mexico."

As noted in the majority opinion, prior to moving to New Mexico in July 2001, Mother visited C.L.W. for one hour per week. After moving to New Mexico, she only visited with the child once, with the last visit occurring in October 2001. There was conflicting evidence regarding the extent to which Mother made contact with DFS or the foster parents after moving from Missouri.

Mother's treatment plan included a stipulation that she, as a minor, live in Grandfather's home. Although she lived with Grandfather, as well as various friends and a brother while she lived in Missouri, once she moved to New Mexico, she lived with Grandmother, including during the time that she was married, and subsequently moved into her own home.

Similar to the statutory ground of abuse and neglect, I find that there was not clear, cogent, and convincing evidence to support the statutory ground of failure to rectify under § 211.447.4(3), RSMo 2000. The conditions that led to C.L.W. being

taken into protective custody no longer exist and, in my view of the facts, Mother has made great strides to comply with her treatment plan, although I agree that most of her efforts in that regard occurred after moving to New Mexico. Her living situation was at times unstable, but became better once she moved to New Mexico. She sought out services there and it was unfortunate that the move created difficulty for her in maintaining visitation with her child and may have led to the termination of her rights as a parent.

Based on a finding that neither ground is supported by clear, cogent, and convincing evidence, I would reverse the termination of Mother's parental rights and therefore, respectfully dissent from the majority opinion.