In the Interest of: B.J.H., JR. & M.R.H., Respondents,

Juvenile Officer, Respondent,

Missouri Children's Division, Respondent,

v.

B.J.H., Sr. (Father), Appellant.

Nos. WD 73717, WD 73755.

Missouri Court of Appeals, Western District.

Jan. 10, 2012.

---

J. Aaron Ellsworth, Lake Ozark, MO, for appellant.

Robert J. Seek, Eldon, MO, for respondent Juvenile Officer.

Gerard "Jay" Harms, Jr., Osage Beach, MO, Guardian Ad Litem.

Before Division Two: MARK D. PFEIFFER, Presiding Judge, VICTOR C. HOWARD, Judge and CYNTHIA L. MARTIN, Judge.

CYNTHIA L. MARTIN, Judge.

B.J.H., Sr. ("Father") appeals from the trial court's judgments terminating his parental rights to his son, B.J.H., Jr. ("Son"), and his daughter, M.R.H. ("Daughter"). In his five points on appeal, Father argues that the trial court erred in finding that there was a statutory ground for terminating his parental rights and in finding that termination of his parental rights was in the best interest of Son and Daughter. We affirm.

**Factual and Procedural Background[1]**

■ Father is the biological father of Son, born February 15, 2007, and of Daughter, born December 16, 2007. At the time each child was born, Father was married to A.E.H. ("Mother"), and they lived together in Versailles, along with Mother's son from a previous relationship. While Mother and Father lived together with the children, Father was employed at Wal–Mart. Father testified that he provided most of the care for the children when he was not working.

Mother and Father separated in May 2008. Father testified that he offered the Versailles residence to Mother. She refused. Instead, Mother took the children with her to live with Father's sister. Mother and the children lived there for two weeks, at which time they moved in with Mother's friend, Ruby. Father testified that while Mother and the children lived elsewhere, he visited them regularly and voluntarily provided child support of approximately $300 per month.

In the days leading up to the Children's Division taking Son and Daughter into protective custody, Mother allowed Father's aunt to take Son and Daughter in her care. Father's aunt observed that Son and Daughter were covered in insect bites and rashes. As a result, Father's aunt purchased medicine for them. Then, Father's aunt delivered Son and Daughter to Father. At that time, Father's aunt told Father that Son and Daughter were living in a tent when she retrieved them from Mother's residence. Father admitted at trial that, although Son and Daughter were suffering from insect bites and rashes, he returned them to Mother.

On July 14, 2008, the Children's Division took Son, Daughter, and Mother's son from a previous relationship into protective custody. The children were in Mother's custody, and Son and Daughter were found covered with untreated and infected insect bites. Son and Daughter also were suffering from yeast infections. Additionally, Mother's son from a previous relationship had wandered from the house and had locked himself in a vehicle. He was missing for at least 2 hours, but Mother did not file a missing child report. The next day, the children were placed in a foster home with E.S. ("Foster Mother") and R.S. ("Foster Father").

A protective custody hearing, which Father attended, was held on July 16, 2008. At this hearing, an order was entered that placed physical and legal custody of the Son and Daughter in the Children's Division and maintained placement with Foster Mother and Foster Father. In addition, supervised visitation was offered to Mother and Father at this time.

Father's first one-hour, supervised visitation took place on July 23, 2008, at the

---

1. On appeal from a judgment terminating parental rights, we review the evidence in the light most favorable to the judgment. *In re K.A.W.,* 133 S.W.3d 1, 11–12 (Mo. banc 2004).

Children's Division office in Miller County. Father's paramour accompanied him to the visit. According to the Children's Division supervisor, Father was hesitant to hold the children, but before the visit ended, Father held and cuddled Son while Father's paramour tended to Daughter's needs.

The one-hour, supervised visits took place weekly and continued until September 2, 2008. At that point, Father began having two-hour, supervised visits weekly with Son and Daughter. The two-hour, supervised visits were scheduled each week until May 15, 2009, and Father attended most of the visits.

In addition to the visits with Son and Daughter, Father had regular meetings with the Family Support Team, which consisted of employees of the Children's Division, a juvenile officer, Son and Daughter's guardian ad litem, Mother, and Father. During those meetings, the Family Support Team developed a written service agreement for Father. Father's written service agreement provided that he would keep Children's Division informed of his current address, schedule and participate in a psychological evaluation, attend all offered visits, attend all Family Support Team meetings and Permanency Planning Review Team meetings, and participate in all services offered by Children's Division.

In February 2009, Father's weekly visits with Son and Daughter were briefly interrupted because Daughter had surgery to correct a cranial deformity. On the day of the surgery, Father arrived at the hospital after the surgery began but stayed until the surgery was complete. Foster Mother was the first person to see Daughter following the surgery. After Foster Mother returned to the hospital's waiting room, Father was able to visit Daughter. During Daughter's five-day, inpatient recovery, Foster Mother stayed in the hospital overnight with Daughter. Father neither stayed overnight with Daughter nor visited Daughter during the remainder of her inpatient recovery.

Also in February 2009, a Children's Division employee inspected Father's residence in Urbana.[2] The inspection revealed that Father would need to obtain a fire extinguisher and additional smoke detectors before Son and Daughter would be allowed to live with him. In addition, Father would need to obtain an escape ladder because his apartment was located in the second story of a building. The Children's Division informed Father how to obtain those items, but he failed to do so.

On May 15, 2009, Father's visitations were extended to four hours. Father's first opportunity for a four-hour visit was on May 19, 2009. Father failed to call the Children's Division office to inform the employees that he would miss the visit. Father attended the next scheduled visit on May 26, 2009, but arrived thirty minutes late. After the May 26, 2009 visit, Father failed to attend four consecutive scheduled visits.

The next visit Father attended was on June 30, 3009. During that visit, Father informed the Children's Division employee that he had been fired from his job at Wal–Mart two weeks earlier for "gross misconduct." Father said that he applied for unemployment and that he would like to obtain his GED. Father also mentioned that his landlord was selling the building in which he lived and that he had to be out of his apartment by August 15, 2009. After that time, Father was without a stable

2. In September 2008, Father moved from his residence in Versailles to an apartment in Urbana.

residence, living either with friends or his aunt in the Eldon area.

Father's first unsupervised visitation was on July 28, 2009. The first two hours of the visit were supervised, and the second two hours were unsupervised. On August 4, 2009, Father's visits were extended to six hours-two hours supervised and four hours unsupervised. The Children's Division employee noted the following: "[Father] did not have to be redirected at any time. He tended to their bathroom and diaper needs, and controlled the children without raising his voice. [Father] has made great improvement over the last few months."

Despite Father's progress with his parenting skills, Father began missing visitations. Of the four visits offered between August 4 and September 15, 2009, Father only attended one. On September 15, 2009, Father attended a Permanency Planning Review Team meeting. At that meeting, the Children's Division employee reported that the inconsistency of Father's visits was hurting Son and Daughter. At that same meeting, Father refused to give the Children's Division his address. Eventually, though, Father said that he lived at his aunt's house, which was less than a mile from the Children's Division office.

Father's visits were still irregular after the September 15, 2009 Permanency Planning Review Team meeting. The next Permanency Planning Review Team meeting was held on March 17, 2010. Between those two meetings, Father was offered twenty-six visits with Son and Daughter but only attended eleven. A Children's Division employee made the following note at that time: "[Father] needs to be consistent; the children are losing their close-ness with [him]. They cry at every visit now and do not want to go with [Father]."

During the time between the September 2009 and March 2010 Permanency Planning Review Team meetings, Father remained unemployed, and his housing situation was unstable. At first, he lived either with friends or his aunt in the Eldon area. In February 2010, Father's paramour bought a mobile home, and he lived with her there. Father and her paramour were making repairs to the mobile home so that Son and Daughter could live with them. In particular, Father and his paramour were repairing the portion of the ceiling in one of the bedrooms that had sustained water damage. A Children's Division employee inspected the mobile home and found that it was not suitable for living due to the mold that developed from the water damage.

Following the March 17, 2010 Permanency Planning Review Team meeting, Father continued to miss scheduled visitations. Of the next twenty-two visits offered to Father,[3] he attended six. At one point, Father missed nine visits in a row without explanation, and as a result, his unsupervised visits were discontinued. Instead, Father was offered three-hour, supervised visits.

On June 28, 2010, Father attended a Family Support Team meeting and reported that he had a new address in Eldon. Father told the team that he was staying in a mobile home outside Eldon with his new paramour. A Children's Division employee inspected the residence the next day. The employee concluded that the residence would be suitable if Father obtained a fire extinguisher, additional

3. The twenty-two visits were offered between March 17, 2010, and August 30, 2010, the date the petitions to terminate Father's parental rights were filed. Two petitions were filed: one to terminate Father's parental rights with respect to Son and one to terminate Father's parental rights with respect to Daughter.

smoke detectors, and a bed for each child. Father never reported to the Children's Division that he obtained and installed the additional smoke detectors,[4] and he admitted during the hearing that he never obtained a fire extinguisher and a bed for each child.

On August 30, 2010, petitions to terminate Father's parental rights with respect to Son and Daughter were filed. The Children's Division continued to offer Father supervised visits leading up to the hearing on the petitions to terminate parental rights. Father was sporadic in his attendance of these visits; of the sixteen visits offered, Father attended eight. During the eight visits attended, Father's interaction with Son and Daughter was minimal. Father was allowed three hours of supervised visitation, but on one occasion, he left after one hour and failed to tell Son and Daughter goodbye. And, during other visits, Father failed to play or talk with the children without being prompted by the Children's Division employee.

A two-day hearing on the petitions to terminate Father's parental rights began on January 12, 2011. The evidence revealed, *inter alia,* that Father had failed to pay child support since April 2010. At the time of the hearing, Father was $2,401.86 in arrears.[5] Father lost his job in June 2009 and remained unemployed at the time

of trial. In addition, the evidence demonstrated that Father did not fully comply with his written service agreement. Father failed to participate fully in the services offered by the Children's Division. In particular, Father failed to finish his parenting classes, failed to complete a psychological evaluation, and failed to apply for low income housing. Father attended all but two Family Support Team and Permanency Planning Review Team meetings, but he failed to attend all of the visits offered by the Children's Division. In fact, Father missed fifty-seven out of the 118 visits offered.

On February 23, 2011, the trial court terminated Father's parental rights with respect to Son and with respect to Daughter. The trial court's judgment[6] indicated that, according to section 211.447.5,[7] there were three bases to terminate parental rights: abandonment,[8] neglect,[9] and failure to rectify.[10]

Father appeals.

## Standard of Review

A trial court's authority to terminate parental rights is purely statutory. Section 211.447.6 requires two findings before parental rights may be terminated. First, the trial court must find that one statutory ground for termination of parental rights exists. Section 211.447.6. The trial court's finding must be supported by

---

4. Father's friend testified that he helped Father install smoke detectors and that they were installed at residence of Father's new paramour.

5. On April 15, 2009, Father was ordered to pay $244 per month in child support.

6. The trial court entered two judgments: one terminating Father's parental rights with respect to Son and one terminating Father's parental rights with respect to Daughter. The judgments are nearly identical, so we will refer to them as one judgment. When the

judgments are not identical, though, we will indicate such.

7. All statutory references are to RSMo 2000 as supplemented unless otherwise indicated.

8. The statutory requirements for abandonment are found in section 211.447.5(1).

9. The statutory requirements for neglect are found in section 211.447.5(2).

10. The statutory requirements for failure to rectify are found in section 211.447.5(3).

"clear, cogent and convincing evidence that grounds exist for termination pursuant to subsection 2, 4 or 5 of [section 211.447]." *Id.* Evidence is clear, cogent and convincing, if it "instantly tilts the scales in favor of termination when weighed against the evidence in opposition and the finder of fact is left with the abiding conviction that the evidence is true." *In re K.A.W.*, 133 S.W.3d 1, 12 (Mo. banc 2004).

We review the trial court's judgment regarding the establishment of a statutory basis for termination of parental rights " 'by determining whether or not it is supported by substantial evidence, is consistent with the weight of the evidence, or accurately declares and applies the law.' " *In re T.A.L.*, 328 S.W.3d 238, 246 (Mo.App. W.D.2010) (quoting *In re C.K.*, 221 S.W.3d 467, 471 (Mo.App. W.D.2007)). "[The] clear, cogent, and convincing standard must be considered when determining whether the trial court's judgment is supported by substantial evidence or is against the weight of the evidence." *Id.*

If the trial court finds a statutory basis for termination of parental rights exists, it moves to its second inquiry— whether terminating parental rights is in the best interests of the child. Section 211.447.6. "On that question, the standard of proof at trial is a preponderance of the evidence, and the standard of review on appeal is abuse of discretion." *In re P.L.O.*, 131 S.W.3d 782, 789 (Mo. banc 2004).

We closely review judgments terminating parental rights because they implicate a fundamental liberty interest protected by the United States Constitution— the right to raise one's child. *T.A.L.*, 328 S.W.3d at 246 (citing *Troxel v. Granville*, 530 U.S. 57, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000)). "The fundamental liberty interest of natural parents in raising their children does not evaporate simply because they have not been model parents or have lost temporary custody of their children to the State." *K.A.W.*, 133 S.W.3d at 12. Thus, "[s]tatutes that provide for the termination of parental rights are strictly construed in favor of the parent and preservation of the natural parent-child relationship." *Id.*

### Point One

Father's first point relied on argues that the trial court erroneously applied section 211.447.2(1) because the judgment indicated that Son and Daughter being in foster care for at least fifteen of the last twenty-two months constituted a statutory basis for terminating parental rights. Section 211.447.2(1) provides that "a petition to terminate the parental rights of the child's parent or parents shall be filed by the juvenile officer or the division ... when [i]nformation available to the juvenile officer or the division establishes that the child has been in foster care for at least fifteen of the most recent twenty-two months." Father claims that section 211.447.2(1) provides a trigger for the filing of a petition to terminate parental rights.

Father's argument is partially correct. "Section 211.447.2(1) creates a temporal trigger specifying when a juvenile officer '*shall*' file a termination petition...." *In re M.N.*, 277 S.W.3d 843, 844–45 (Mo.App. W.D.2009). Section 211.447.2(1) does not establish a basis for termination. *In re M.D.R.*, 124 S.W.3d 469, 476 (Mo. banc 2004). Instead, it requires a petition to be filed, which "merely opens the door" for the state to prove that statutory grounds for termination exist. *Id.*

Despite the correct reading of the underlying law, Father fails to read the trial court's judgment correctly. The judgment states, in relevant part:

The minor child[ren have] been in foster care for at least 15 of the most recent 22 months having been in foster care since July 14, 2008. Pursuant to Section 211.447.2(1), RSMo, and *In re M.D.R.*, 124 S.W.3d 469 (Mo. banc 2004) this fact is sufficient to trigger a review to determine whether there are grounds upon which to terminate the rights of the parents.

The judgment is clear in that the trial court merely used section 211.447.2(1) to determine whether there were grounds for the petition to be filed. Father's first point is denied.

### Points Two, Three, and Four

■ Father's second, third, and fourth points on appeal concern whether the trial court erred in finding a basis to terminate Father's parental rights. As noted above, the trial court found that there were three statutory bases to terminate Father's parental rights: abandonment, neglect, and failure to rectify. Father challenges all three findings, but only one statutory ground must be proven to support termination.[11] *In re A.M.S.*, 272 S.W.3d 305, 308 (Mo.App. W.D.2008).

*Point Two*

■ In his second point relied on, Father claims that the trial court erred in finding that evidence existed to establish abandonment, as defined in section 211.447.5(1)(b), constituted a basis for terminating Father's parental rights. More particularly, Father claims that the trial court erroneously applied the statute because good cause existed for Father's failure to pay support and because Father made arrangements to visit Son and Daughter.

Under section 211.447.5(1)(b), parental rights may be terminated if

The child has been abandoned. For purposes of this subdivision a **"child"** means any child over one year of age at the time of filing of the petition. The court shall find that the child has been abandoned if, for a period of six months or longer:

. . .

The parent has, without good cause, left the child without any provision for parental support and without making arrangements to visit or communicate with the child, although able to do so....

The statute is clear that the trial court must make two findings—that, without good cause, the parent failed to provide parental support for the preceding six months and that, although able to do so, the parent failed to make arrangements to visit or communicate with the child for the preceding six months—in order to conclude abandonment constituted a basis for terminating parental rights. Father challenges the trial court's finding of both.

The trial court's conclusions of law state, in relevant part:

The juvenile officer has proved by clear, cogent and convincing evidence that grounds for termination of [Father's] parental rights to [Son and Daughter] exist as follows:

. . . .

Under Section 211.447.5(1)(b), RSMo, in that *he has failed to provide for the support of said child.*

(Emphasis added). The trial court made an express conclusion regarding Father's failure to provide support for the preceding six months. But section 211.447.5(1)(b) also requires that the trial court find that the parent failed to make

---

11. Although only one statutory basis must be proven to support termination, we have reviewed each basis on which the trial court relied.

arrangements to visit or communicate with the child for the preceding six months. While the trial court made no explicit conclusion of law regarding Father's failure to make arrangements to visit or communicate with Son and Daughter, its findings of fact set forth Father's entire visitation history with Son and Daughter. Father's visitation history indicates that, in the six months leading up to the filing of the petition, Father missed nineteen of the twenty-five offered visits. We conclude that those factual findings, combined with its conclusion that Father failed to provide parental support, indicate that the trial court concluded that abandonment was a statutory basis for terminating Father's parental rights. As a result, we must determine whether there is clear, cogent, and convincing evidence to support the trial court's finding of abandonment.

In order to find abandonment, the trial court must find clear, cogent, and convincing evidence that "[t]he parent has, without good cause, left the child without any provision for parental support." Section 211.447.5(1)(b). Father argues that the evidence presented at trial indicated that he had good cause not to pay child support: unemployment.

The evidence presented at trial indicated that, on April 15, 2009, Father was ordered to pay $244 in child support per month. While employed at Wal–Mart, Father paid the court-ordered child support. Father was fired for gross misconduct in June 2009 and has been unemployed since that time. Father's last child support payment was made in April 2010, and at the time of trial, he was $2,401.86 in arrears.

■ Father's argument that his unemployment constitutes good cause to excuse his failure to provide parental support is without merit. The record is devoid of evidence indicating that Father was incapable of being employed. To the contrary, a Children's Division employee testified that she gave Father employment leads, but he never applied for those jobs. In addition, Father missed an unemployment report date, and his unemployment benefits were discontinued. Further, Father admitted at trial that he was capable of working but that he had not tried "as hard as [he] should" to find employment. " 'Evidence that a parent was capable of employment, although unemployed, is a sufficient basis for a trial court to determine that the parent was able to provide financial support for the child.' " *In re E.F.B.D.*, 245 S.W.3d 316, 324 (Mo.App. S.D.2008) (quoting *In re Q.M.B.*, 85 S.W.3d 654, 660 (Mo.App. W.D.2002)). Accordingly, based on testimony from the Children's Division employee and Father, the trial court correctly determined that there was clear, cogent, and convincing evidence that Father failed to provide parental support without good cause.

■ Father's second argument concerns the second requirement for abandonment—the failure to "mak[e] arrangements to visit or communicate with the child, although able to do so." Section 211.447.5(1)(b). In the six months preceding the filing of the petition, Father attended only six visitations with Son and Daughter, despite being offered twenty-five visitations. And, for those visitations he failed to attend, he did not call the Children's Division to give notice of his absence. According to section 211.447.8, "[t]he court may attach little or no weight to infrequent visitations, communications, or contributions." In other words, the court does not have to give effect to what it construes as "token gestures" by the parent. *In re Adoption of C.M.B.R.*, 332 S.W.3d 793, 818 (Mo. banc 2011). Father's attendance of an average of one visitation per month in the six months preceding the filing of the petition constitutes clear, co-

gent, and convincing evidence that Father failed to make arrangements to visit or communicate with Son and Daughter.

Because there was clear, cogent, and convincing evidence presented at trial to support both prongs of abandonment, as defined in section 211.447.5(1)(b), Father's second point is denied.

*Point Three*

 Father's third point on appeal claims that the trial court erred in finding that neglect, as set forth in section 211.447.5(2), constituted a basis to terminate Father's parental rights.[12] Father's dispute with the finding of neglect is two-fold[13]: (1) he argues that the trial court failed to consider, pursuant to *In re K.A.W.*, whether the alleged neglect had an impact on Son and Daughter, whether Father's conduct was severe enough to constitute neglect, and whether Father's conduct indicated a likelihood of future harm; and (2) he argues that the trial court's findings of fact and conclusions of law with respect to neglect are not supported by clear, cogent, and convincing evidence.

Under section 211.447.5(2), parental rights may be terminated if:

The child has been abused or neglected. In determining whether to terminate parental rights pursuant to this subdivision, the court shall consider and make findings on the following conditions or acts of the parent:

(a) A mental condition which is shown by competent evidence either to be permanent or such that there is no reasonable likelihood that the condition can be reversed and which renders the parent unable to knowingly provide the child the necessary care, custody and control;

(b) Chemical dependency which prevents the parent from consistently providing the necessary care, custody and control of the child and which cannot be treated so as to enable the parent to consistently provide such care, custody and control;

(c) A severe act or recurrent acts of physical, emotional or sexual abuse toward the child or any child in the family by the parent, including an act of incest, or by another under circumstances that indicate that the parent knew or should have known that such acts were being committed toward the child or any child in the family; or

(d) Repeated or continuous failure by the parent, although physically or finan-

---

**12.** Having found in connection with our discussion of Father's point relied on two that clear and convincing evidence existed to support termination of Father's parental rights pursuant to section 211.447.5(1)(b), our review of the termination of Father's parental rights pursuant to section 211.447.5(2) (as addressed in Father's point relied on three) and pursuant to section 211.447.5(3) (as addressed in Father's point relied on four) is *ex gratia*, as only one statutory ground to support termination must be proven. *In re A.M.S.*, 272 S.W.3d 305, 308 (Mo.App. W.D. 2008).

**13.** In addition to his two arguments regarding the trial court's findings of fact and conclusion of law with respect to neglect, Father also complains that the petition did not plead neglect as a basis for termination. The petition explicitly alleges that the juvenile officer is seeking termination of parental rights pursuant to section 211.447 in that Father failed to support Son and Daughter, failed to maintain meaningful contact with Son and Daughter, and has "minimal emotional ties" with Son and Daughter. The allegations made by the juvenile officer are sufficient to plead neglect as a basis for termination. Further, even if the allegations were insufficient, Father failed to object to the evidence and testimony establishing neglect at trial. As such, the issue was tried by consent. *See In re S.M.H.*, 160 S.W.3d 355, 366 (Mo. banc 2005). Father's argument is rejected.

cially able, to provide the child with adequate food, clothing, shelter, or education as defined by law, or other care and control necessary for the child's physical, mental, or emotional health and development. . . .

▮ The trial court must make findings on each of the four factors. *In re K.A.W.*, 133 S.W.3d at 16. And if a factor is irrelevant, the trial court must state why in its findings of fact and conclusions of law. *Id.* While the trial court must make findings on each factor, parental rights may be terminated on the finding of one factor. *See In re T.M.E.*, 169 S.W.3d 581, 585 (Mo.App. W.D.2005).

▮ The trial court's conclusions of law state, in relevant part:

> The juvenile officer has proved by clear, cogent and convincing evidence that grounds for termination of [Father's] parental rights to [Son and Daughter] exist as follows:
>
> . . . .
>
> Under Section 211.447.5(2), RSMo, in that the child has been neglected.

In its findings of fact, the trial court made specific findings regarding the four factors set forth in section 211.447.5(2). In particular, the trial court noted that there was no evidence offered regarding section 211.447.5(2)(a), (b), or (c) so that those factors were irrelevant in determining whether Father's parental rights should be terminated. The trial court did find, though, that Father neglected Son and Daughter "in that he has repeatedly or continuously failed to provide adequate food, clothing, shelter, education, or other care or control necessary for the [children's] physical, mental or emotional health and development." In particular, the trial court found that Father neglected Son and Daughter by failing to provide a stable and appropriate residence for Son and Daughter and by failing to provide for the emotional health of Son and Daughter through his periods of irregular visitation and by failing to attend their medical appointments.[14]

Father claims that the trial court erred in failing to consider what *In re K.A.W.* deems the three "essential part[s] of any determination whether to terminate parental rights": (1) whether Father's conduct has had or will have a detrimental impact on Son and Daughter; (2) whether Father's conduct is severe enough to constitute neglect; and (3) whether Father's conduct has indicated a likelihood of future harm if Son and Daughter continue to have a relationship with him.[15] *See In re*

---

14. The trial court also noted in its findings of fact and conclusions of law that Father had neglected Son and Daughter by returning the children to Mother even though he observed them to be covered by infected insect bites and rashes after being in Mother's care. Because terminating parental rights on the basis of neglect must "be based on conduct at the time of termination, not just at the time jurisdiction was initially taken," we will not discuss this finding in our evaluation of the trial court's findings of fact and conclusions of law. *See In re K.A.W.*, 133 S.W.3d at 10.

15. Father claims that *In re K.A.W.* stands for the proposition that the trial court must consider the three essential parts in finding that a statutory basis exists to terminate parental rights. The language of *In re K.A.W.*, though, seems to indicate that the appellate court, in its review, will consider the three essential parts to determine whether there was clear, cogent, and convincing evidence to establish a statutory basis. 133 S.W.3d at 12 ("Each [statutory ground found by the trial court] must be supported by clear, cogent and convincing evidence and will be analyzed for: whether there was sufficient reason to believe that it had an impact upon the [child], whether it was severe enough to constitute abuse or neglect and whether it provides an indication of the likelihood of future harm to the [child].''). The intended import of the Supreme Court's discussion of the three essen-

*K.A.W.*, 133 S.W.3d at 9–11. Father's argument fails because there was sufficient evidence presented at trial to establish these three essential parts of the trial court's determination to terminate Father's parental rights. And the trial court indicated such in its findings of fact and conclusions of law.

The first essential part of the determination to terminate parental rights is the impact of Father's conduct on Son and Daughter. *Id.* at 10–11. The evidence presented at trial indicated that, in the months directly following Son and Daughter's placement in foster care, Father consistently attended weekly visitations. However, as time passed, Father's visitations became intermittent. According to the testimony of a Children's Division employee, the inconsistency of Father's visitations coincided with Son and Daughter's negative reactions toward Father. In particular, after Father missed several, consecutive visitations, Son and Daughter cried when they arrived at the Children's Division office. Foster Mother testified at trial that Son's behavior changed. Son begged Foster Mother not to take him to the Children's Division office to see Father, and Son became angry before visitations. Foster Mother also testified that Son's bedwetting relapsed. In addition, Father testified at trial that missing nine consecutive visitations affected the bond with Son and Daughter. The trial court noted in its findings of fact and conclusions of law that "[s]everal witness [sic] observed that the children became resistant toward visitation and exhibited anger toward [Father] after he missed visits partic-

ularly when he missed several consecutive visits."

The second essential part of the determination to terminate parental rights is whether Father's conduct is severe enough to constitute neglect. *In re K.A.W.*, 133 S.W.3d at 11. "Some parental conduct will harm a child without constituting abuse or neglect." *Id.* To determine what conduct rises to level of neglect, we look to the statute. *Id.* Under section 211.447.5(2)(d), a child has been neglected if the parent repeatedly or continuously fails, "although physically or financially able, to provide the child with adequate food, clothing, shelter or education as defined by law, or other care and control necessary for the child's physical, mental, or emotional health and development."

The trial court established its finding of neglect on three bases: (1) Father failed to maintain a stable and appropriate residence for Son and Daughter; (2) Father failed to meet the emotional needs of Son and Daughter because of his inconsistent visitation; and (3) Father failed to meet the emotional needs of Son and Daughter because of his failure to attend their medical appointments. The evidence presented at trial indicated that, while the children were in foster care, Father's living situation was unstable. He bounced between living with paramours, friends, and his aunt. Further, the record indicates that the Children's Division informed Father that he would have to obtain a fire extinguisher and smoke detectors in order to make his residence[16] safe enough for Son and Daughter to be placed in his custody. Despite receiving notice that he would have to obtain a fire extinguisher and

---

tial parts need not be determined to dispose of this appeal. We thus afford Father the benefit of his argument without accepting its premise.

16. Because Father lived in several residences while Son and Daughter were in foster care, the Children's Division inspected more than residence. A fire extinguisher and smoke detectors were needed at every residence the Children's Division inspected.

smoke detectors in February 2009, Father had not yet obtained those items by the time of trial, nearly two years later. As discussed thoroughly in the facts, Father attended visitations sporadically. Out of the 118 visits offered, Father missed fifty-seven. And, as discussed above, the evidence at trial indicated that missing visitations caused Son and Daughter emotional harm. Lastly, there was evidence presented at trial that Father failed to attend Son and Daughter's medical appointments. Foster Mother testified that she informed the Children's Division of all of Son and Daughter's medical appointments, and the Children's Division would relay the information to Father. Despite knowing about the appointments, Father only attended one medical appointment while the children were in foster care.

These three bases—and the evidence supporting them—demonstrate that Father's conduct was severe enough to constitute neglect upon which parental rights could be terminated. The evidence establishes that, while Son and Daughter were in foster care, Father failed to provide adequate shelter for Son and Daughter and that his failure to exercise visitation and failure to attend medical appointments was detrimental to Son and Daughter's emotional health. And the trial court noted such in its findings of fact and conclusions of law. Under section 211.447.5(2)(d), the repeated or continuous failure to provide adequate housing or emotional support constitutes neglect sufficient to terminate parental rights.

The third essential part of the determination to terminate parental rights is likelihood of future harm if Son and Daughter continue to have a relationship with Father. *In re K.A.W.*, 133 S.W.3d at 9–10. "Past behavior can support grounds for termination, but only if it is convincing-

ly linked to predicted future behavior. There must be some explicit consideration of whether the past acts provide an indication of the likelihood of future harm." *Id.* (footnote omitted). The evidence at trial indicated that Father attended visitations and improved in his interactions with the children shortly after Son and Daughter entered foster care. As time passed, though, Father's visitations became intermittent and his interactions with Son and Daughter regressed. Father's living situation did not stabilize, and he failed to obtain the items needed to make his residences suitable living environments for the children. Father was afforded numerous opportunities by the Children's Division to demonstrate his commitment by complying with the reasonable conditions to secure custody of the children. Yet Father inexplicably failed to take advantage of those opportunities. Accordingly, the trial court found that "[t]here is little likelihood that those conditions will be remedied at an early date so that [Son and Daughter] can be placed with [F]ather in the near future." Because "it is difficult to predict future harm, to ask anything more of the trial court would be asking it to predict the future with a near impossible degree of certainty." *In re B.H.*, 348 S.W.3d 770, 777 (Mo. banc 2011).

Contrary to Father's assertion, the trial court considered the three essential parts of the determination to terminate parental rights, as set forth in *In re K.A.W.* And, as illustrated above, there is clear, cogent, and convincing evidence to support each essential part. Accordingly, Father's third point is denied.

*Point Four*

Father's fourth point on appeal claims that the trial court erred in finding that there was clear, cogent, and convincing to establish section 211.447.5(3) as a basis for terminating Father's parental

rights. In particular, Father argues that there is not clear, cogent, and convincing evidence to support the trial court's conclusion.

■■■ Under section 211.447.5(3), parental rights may be terminated if:

The child has been under the jurisdiction of the juvenile court for a period of one year, and the court finds that the conditions which led to the assumption of jurisdiction still persist, or conditions of a potentially harmful nature continue to exist, that there is little likelihood that those conditions will be remedied at an early date so that the child can be returned to the parent in the near future, or the continuation of the parent-child relationship greatly diminishes the child's prospects for early integration into a stable and permanent home. In determining whether to terminate parental rights under this subdivision, the court shall consider and make findings on the following:

(a) The terms of a social service plan entered into by the parent and the division and the extent to which the parties have made progress in complying with those terms;

(b) The success or failure of the efforts of the juvenile officer, the division or other agency to aid the parent on a continuing basis in adjusting his circumstances or conduct to provide a proper home for the child;

(c) A mental condition which is shown by competent evidence either to be permanent or such that there is no reasonable likelihood that the condition can be reversed and which renders the parent unable to knowingly provide the child the necessary care, custody and control;

(d) Chemical dependency which prevents the parent from consistently providing the necessary care, custody and control over the child and which cannot be treated so as to enable the parent to consistently provide such care, custody and control....

The statute requires that the trial court make three findings in order for section 211.447.5(3) to serve as the statutory basis for terminating parental rights: (1) the child has been under the juvenile court's jurisdiction for at least one year; (2) the conditions that led to the assumption of jurisdiction still exist or conditions of a potentially harmful nature continue to exist; and (3) there is little likelihood that those conditions will be remedied so that the child can be returned to the child in the near future or the continuation of the parent-child relationship greatly diminishes the child's prospects for early integration into a stable and permanent home. *In re T.A.L.,* 328 S.W.3d at 247. In making those three findings, the trial court must consider the four factors outlined in section 211.447.5(3)(a)–(b). Proof by clear and convincing evidence of one of the four factors is sufficient to support termination of parental rights. *In re A.M.S.,* 272 S.W.3d at 308.

The trial court found that the evidence presented at trial established that section 211.447.5(3) constituted a statutory basis for terminating Father's parental rights. The findings of fact and conclusions of law state, in relevant part:

Under Section 211.447.5(3) the conditions which led to the court taking jurisdiction still persist or conditions of a potentially harmful nature continue to exist. These conditions included [Father's] lack of suitable, safe and stable housing. There is little likelihood that those conditions will be remedied at an early date so that the child can be placed with [F]ather in the near future. a. [Son and Daughter have] been under the jurisdiction of the juvenile court for a period in excess of one year.

b. Since the date of adjudication [Father] has failed to have a stable and appropriate residence for [Son and Daughter]

. . . .

c. [Father] entered into a service agreement or plan of reunification on October 14, 2008. He has failed to fulfill the terms of such agreement.

. . . .

d. The efforts of the juvenile officer and the Children's Division to aid [Father] in adjusting his circumstances and conduct to provide a proper home for said child have failed.

The trial court found that the evidence presented at trial established the three statutory requirements and two of the factors—failure to fulfill the terms of the service agreement and failure of the efforts of the juvenile officer and the Children's Division to aid Father.

Contrary to Father's argument, there is clear, cogent, and convincing evidence to support the trial court's findings. The record indicated that Son and Daughter were under the jurisdiction of the juvenile court for more than one year, a fact which Father does not dispute. Father disputes the trial court's other findings, though, including the existence of potentially harmful conditions, the unlikelihood of conditions improving in the near future, failure to fulfill the terms of the service agreement, and failure to the efforts of the juvenile officer and the Children's Division to aid Father.

The trial court found that Father's lack of suitable, safe, and stable housing constituted a potentially harmful condition that continued to exist. Father argues that he has maintained an appropriate residence since July 2010. Father ignores, however, the evidence presented at trial that indicated that, despite receiving notice in February 2009 that he would have to obtain a fire extinguisher and smoke detectors in order for Son and Daughter to be placed in his custody, Father had not yet obtained those items by the time of trial, nearly two years later. Thus, there was clear, cogent, and convincing evidence that a potentially harmful condition—lack of suitable, safe, and stable housing—continued to exist.

Father also challenges the trial court's finding of that there is little likelihood that Father will remedy the potentially harmful condition so that Son and Daughter can be returned to his home. The evidence presented at trial established that Father failed to obtain the necessary items for his residence in the two years leading up to trial. "[A] parent's past patterns provide vital clues about present and future conduct." *In re E.F.B.D.*, 245 S.W.3d at 327. Father's two-year failure to obtain a fire extinguisher and smoke detectors was a "vital clue." It was unlikely that Father would obtain the necessary items to make his residence suitable, safe, and stable so that Son and Daughter could be placed in his custody.

The trial court found that two of the section 211.447.5(3) factors were established at trial. First, the trial court found that Father failed to fulfill the terms of his written service agreement with the Children's Division. The written service agreement included six tasks: (1) Father will provide current address; (2) Father will make an appointment for a psychological evaluation; (3) Father will participate in a psychological evaluation; (4) Father will attend all visits; (5) Father will attend all Family Support Team and Permanency Planning Review Team meetings; and (6) Father will participate in all services that are offered by the Children's Division. Father completed one task, initially providing his current address. The rest of the tasks were incomplete at the time of trial. Children's Division employees testi-

fied at trial as to Father's progress on the written service agreement. The evidence presented at trial established that Father neither made an appointment for nor participated in a psychological evaluation. The Children's Division employees testified that, while he attended most of the visitations shortly after Son and Daughter were placed in foster care, his attendance became more sporadic as time passed. And when Father failed to attend a scheduled visitation, he failed to call the Children's Division office to report his absence though he was repeatedly asked to do so to avoid the inconvenience and confusion caused Son and Daughter when they would arrive for visitations only to be disappointed by Father's unexplained failure to attend. Further, the Children's Division employees testified as to Father's failure to participate in the services offered.

The trial court found that there was evidence to establish another section 211.447.5(3) factor: Father's failure to participate in the services offered by the Children's Division. The evidence presented to the trial court indicated that Father failed to attend fifty-seven out of the 118 visits the Children's Division offered. In addition, Children's Division employees testified that Father failed to pursue employment leads and failed to apply for low-income housing. Father completed six parenting classes and claims to have graduated from the program but could not provide a certificate of completion to the Children's Division. Father also failed to attend Son and Daughter's medical appointments and showed no interest in learning how to meet their medical needs.

There was clear, cogent, and convincing evidence supporting each of the trial court's findings with respect to section 211.447.5(3). Accordingly, Father's fourth point is denied.

## Point Five

In his fifth point on appeal, Father argues that the juvenile officer failed to prove by a preponderance of evidence that termination of his parental rights was in the best interest of Son and Daughter. Thus, Father claims, the trial court abused its discretion in finding that terminating Father's parental rights was in the best interest of Son and Daughter.

After the trial court has identified a statutory basis for terminating parental rights, section 211.447.6 provides that the trial court must find that terminating the parent's rights is in the best interest of the child. In making that decision, the court must evaluate and make findings on the following factors:

(1) The emotional ties to the birth parent;

(2) The extent to which the parent has maintained regular visitation or other contact with the child;

(3) The extent of payment by the parent for the cost of care and maintenance of the child when financially able to do so including the time that the child is in the custody of the division or other child-placing agency;

(4) Whether additional services would be likely to bring about lasting parental adjustment enabling a return of the child to the parent within an ascertainable period of time;

(5) The parent's disinterest in or lack of commitment to the child;

(6) The conviction of the parent of a felony offense that the court finds is of such a nature that the child will be deprived of a stable home for a period of years; provided, however, that incarceration in and of itself shall not be grounds for termination of parental rights;

(7) Deliberate acts of the parent or acts of another of which the parent knew or

should have known that subjects the child to a substantial risk of physical or mental harm.

Section 211.447.7. "There is no requirement, statutory or otherwise, that all seven of these factors must be negated before termination can take place; likewise, there is no minimum number of negative factors necessary for termination." *In re C.A.M.*, 282 S.W.3d 398, 409 (Mo.App. S.D.2009).

 The trial court made findings regarding the seven factors, and they are, in relevant in part:

a. There are ties between Father and [Son], but those ties have been damaged severely by [Father] having failed to consistently exercise visitation with the child to the point that the child is angry toward [F]ather and does not want to be with or visit with him.[17]

b. [Father] has maintained an erratic pattern of visitation with several periods of consecutively missed visits as found above.

c. [Father] has failed to provide any significant support since April 6, 2010.

d. There are no additional services which could be provided by the Juvenile Office or the Children's Division which would be likely to bring about a lasting parental adjustment enabling the return of the minor child to the biological parents within an ascertainable period of time. Prior attempts to provide services to [F]ather have been hindered by his failure to exercise visitation despite being given numerous opportunities to become consistent and have visitation time expanded. No reasonable explanation

has been given as to why he failed to exercise a majority of such visitation.

e. [Father] claims to be committed to [Son and Daughter]. His actions, however, demonstrate a lack of commitment to the child[ren].

(1) Since [Son and Daughter have] been in care he has failed to take steps necessary to provide a safe and suitable home. By his own admission, the requests that he obtain smoke detectors, obtain a fire extinguisher, obtain an escape ladder and obtain the required number of beds were not difficult or financially unreasonable.

(2) Since [Son and Daughter have] been in care he has failed to attend medical appointments despite being notified in advance of the same.

(3) Since [Son and Daughter have] been in care he has failed to consistently exercise visitation and after reaching the point where he was given unsupervised visits with the child he has missed increasing numbers of consecutive visits without good reason.

(4) Even though he has the capacity to work he has done little to obtain employment and as a result has paid no support since April 6, 2010.

f. [Father] has no known felony convictions.

g. [Father's] deliberate return of the children to [Mother] after receiving physical custody of them with numerous insect bites and rashes and after observing roaches in one of the car seats was an act which he should have known could be harmful to the child[ren's] physical health. In addition, his failure

---

17. This finding is unique to terminating Father's parental rights with respect to Son. The trial court's finding with respect to Daughter state, in relevant part:

There are ties between [Father] and [Daughter], but those ties have been dam-

aged severely by [Father] having failed to consistently exercise visitation with the child to the point that the child does want to be with or visit with him.

to exercise visitation on a consistent basis and particularly failing to exercise visits for extended period of time were acts which he should have known could be harmful to [the children's] emotional health.

The trial court properly evaluated and made findings on the seven factors set forth in section 211.447.7. There is nothing in those findings indicating that the trial court abused its discretion. In fact, those findings are similar to the findings of fact and conclusions of law that the court made with respect to the statutory bases for terminating parental rights. As noted above, there was clear, cogent, and convincing evidence establishing those findings of fact and conclusions of law. The burden for establishing that terminating parental rights is in the best interest of the child is merely preponderance of the evidence. *In re P.L.O.*, 131 S.W.3d at 789. The trial court's findings necessarily meet the lower burden. *See In re B.H.*, 348 S.W.3d at 776 (noting that the burden of proof for finding that termination is in the child's best interest is lower than the burden of proof for establishing a statutory basis for terminating parental rights). Accordingly, Father's fifth point is denied.

## Conclusion

The trial court's judgment is affirmed.

All concur.