

# MISSOURI COURT OF APPEALS
## WESTERN DISTRICT

| | |
|---|---|
| IN THE INTEREST OF: E.B.M., | ) |
| | ) WD83612 |
| Juvenile; | ) |
| | ) OPINION FILED: |
| JUVENILE OFFICER, | ) |
| | ) September 29, 2020 |
| Respondent, | ) |
| v. | ) |
| | ) |
| B.M., | ) |
| | ) |
| Appellant. | ) |

**Appeal from the Circuit Court of Jackson County, Missouri**
**Honorable James Dale Youngs, Judge**

**Before Division One:**
**Thomas H. Newton, P.J., Mark D. Pfeiffer and Edward R. Ardini, Jr., JJ.**

B.M. (Father) appeals the Jackson County Circuit Court judgment terminating parental rights in E.B.M. (Child) who was born in January 2018. Father challenges the trial court's application of law, the weight and sufficiency of the evidence, the exercise of its discretion, and rulings in alleged violation of the constitutional right to travel freely. We reverse and remand for reconsideration in light of the home study that was finalized after the termination hearing concluded.

Father and Mother, who were not married, lived in a Texas hotel in January 2018 when Mother abruptly left and traveled to Missouri to give birth to the Child.[1] Because Mother had unmedicated mental health problems and one of the Child's half-siblings had previously died from malnutrition and dehydration, the Child was immediately taken under the Jackson County Circuit Court's jurisdiction and into Children's Division custody.[2] Father searched for Mother, guessing that she had gone to the Kansas City, Missouri area, found the hospital where she had given birth, and visited the Child in the hospital two days after the birth; he participated in person in the protective custody hearing during which the trial court ordered the completion of an Interstate Compact on the Placement of Children (ICPC) home study for Father. Father returned to Dallas, Texas. Father had two teenaged children, who were living with their mother in Indiana, and a good support system there, so he and the Child's Mother moved to Indiana in March 2018. At a disposition hearing in March 2018, the trial court expressed concern about Father's housing instability and ordered that Father have no contact with the Child until paternity was established. Father secured an apartment in Indianapolis several months after the return to Indiana and informed the Children's Division. Mother lived with him off and on until December 2018, when the relationship ended.

---

[1] "We defer to the fact-finding of the juvenile court and consider all evidence and reasonable inferences in the light most favorable to the judgment. [T]he standard of proof may be satisfied even though the trial court has contrary evidence before it or evidence in the record might support a different conclusion." *In re L.M.,* 322 S.W.3d 564, 569 (Mo. App. S.D. 2010) (citations omitted).

[2] Mother had a history of schizophrenia and psychosis and showed signs of mental illness when the Child was born, to the extent that she refused to allow the physicians to render proper medical care. Her rights as to her other children had already been terminated as of January 2018. Her rights to the Child were terminated in July 2019.

Father communicated sporadically with the Children's Division from January 2018 until the week before a hearing held in late June 2018 when he provided a copy of his lease. The trial court found, among other matters, that neither parent had communicated with the Children's Division between the March and June 2018 juvenile proceedings. The trial court also found that, while paternity testing had been arranged for Father in Texas in February 2018, he failed to appear, and neither parent had visited the Child or provided for the Child financially or otherwise since birth. The record shows that Father missed the test because he was in the hospital. The juvenile court concluded that the Child had been abandoned and changed the permanency goal to termination of parental rights and adoption, although both parents were ordered to participate in reunification services and paternity testing was ordered again; Father was to have no contact with the Child until paternity was established.

Paternity testing was conducted in August 2018 and showed that Father was the Child's father, but he did not learn the results for several months. The Juvenile Officer filed a petition in September 2018 to terminate Father's parental rights on grounds of abandonment, abuse/neglect, parental unfitness, and failure to rectify. After a third caseworker finished training and was assigned the case file, which included the testing results, she reached out to Father and was able to arrange a second visit with the Child in November 2018. Before the termination hearing began in October 2019, Father traveled to Kansas City five additional times to see the Child; some of the supervised one-hour visits coincided with court hearings or the psychological evaluation he was ordered to undergo. The evidence showed that he had to travel by bus to Kansas City, which took a significant amount of time and expense—up to 20 hours for the round-

3

trip and $300—and he was sometimes forced to sleep in the bus station for lack of funds to pay for a hotel room. Between June and October 2019, he traveled to Florida and Chicago for a wedding and family business without incurring any expense other than $50 for the bus to Chicago.[3] While he brought toys, diapers, formula, and clothes on several of the visits, Father did not contribute to the Child's financial support, nor had he been ordered to do so. Father regularly participated in Family Support or Permanency Planning Review Team meetings and court hearings in 2019 by phone.

The ICPC application was not finalized in Kansas City until February 2019; it was not assigned to an Indiana caseworker tasked with conducting the home study until September 2019, and she did not finish the study until after the termination hearing concluded.[4] The trial court refused to delay the start of the termination hearing on account of the incomplete ICPC and denied Father's request to hold the termination hearing record open for receipt of the home study after the hearing ended in December 2019. According to the trial court, the ICPC results would not be "relevant for [it] to rely on or determine as it relates to the questions that are in front of [the court]."

The trial court terminated Father's parental rights in January 2020 under sections 211.447.2(2) (abandonment), 211.447.5(2) (abuse or neglect), and 211.447.5(3) & (5)[5]

---

[3] Father testified that he did not visit with the Child in July, August, and September 2019, because he was involved in parenting and life skills classes in Indianapolis and was carefully budgeting his income. He also volunteers at the parenting center and took advantage of therapeutic services offered there.

[4] Before testimony was taken during the hearing, the trial court expressed its considerable frustration with the length of time it takes for the agencies in two states to initiate and complete an ICPC home study. Father filed a motion in February 2019 requesting that the Children's Division show cause why it should not be held in contempt for failing to comply with orders from March and October 2018 and January 2019 to initiate an ICPC home study.

[5] Statutory references are to RSMo. (2016, as supplemented in 2017 and 2018), unless otherwise indicated.

4

(child under jurisdiction for one year/failure to rectify and parental unfitness), and Father filed motions for new trial and to enter a new judgment or to amend the judgment. Father sought a new trial or to enter a new judgment on the ground that he had newly discovered evidence—the ICPC home study results, which recommended that the Child be placed with Father. The motion to amend the judgment asserted nine bases for relief. The trial court denied the motions; Father raises ten points on appeal.

## Legal Analysis

> A trial court's authority to terminate parental rights is purely statutory. Section 211.447.6 requires two findings before parental rights may be terminated. First, the trial court must find that one statutory ground for termination of parental rights exists. § 211.447.6. The trial court's finding must be supported by clear, cogent and convincing evidence that grounds exist for termination pursuant to subsection 2, 4 or 5 of [section 211.447]. Evidence is clear, cogent and convincing, if it instantly tilts the scales in favor of termination when weighed against the evidence in opposition and the finder of fact is left with the abiding conviction that the evidence is true.

*In re B.J.H., Jr.,* 356 S.W.3d 816, 823-24 (Mo. App. W.D. 2012) (citations omitted). We review the statutory basis of a judgment terminating parental rights "by determining whether or not it is supported by substantial evidence, is consistent with the weight of the evidence, or accurately declares and applies the law." *Id.* at 824 (citation omitted). "Even though a trial court finds multiple statutory grounds exist for termination of parental rights, an appellate court does not have to decide if sufficient evidence supports each finding. We can affirm if any one ground thus found is supported by evidence that meets the clear, cogent, and convincing standard." *In re C.L.W.*, 115 S.W.3d 354, 356 (Mo. App. S.D. 2003). "If the trial court finds a statutory basis for termination of parental rights exists, it moves to its second inquiry--whether

5

terminating parental rights is in the best interests of the child. Section 211.447.6." *In re B.J.H., Jr.,* 356 S.W.3d at 824 (citation omitted).

Because termination of parental rights implicates a fundamental liberty interest protected by the U.S. Constitution, we review a termination judgment closely. *Id.* "The fundamental liberty interest of natural parents in raising their children does not evaporate simply because they have not been model parents or have lost temporary custody of their children to the State." *In re K.A.W..,* 133 S.W.3d 1, 12 (Mo. banc 2004). Accordingly, we strictly construe statutes terminating parental rights in favor of the parent and of maintaining the natural parent-child relationship. *Id.*

Father's ten points include challenges to the evidence supporting the grounds for termination as well as the trial court's conclusions regarding the Child's best interest. A number of the points focus on the trial court's abandonment determination, evidence of which supports the other grounds for termination that the trial court found. Father also asserts a constitutional right-to-travel claim. We do not consider the merits of any of these issues, because we believe that the trial court abused its discretion in overruling Father's motion for new trial on the basis of newly discovered evidence, so we consider point nine only.

In that point, Father argues that the trial court abused its discretion by effectively excluding the ICPC home study from evidence and by denying the post-judgment motion for new trial once that evidence became available. Because the trial court ordered an ICPC home study and "excluded related testimony in anticipation of the

home study," Father claims that the premature termination of parental rights without that evidence shocks the sense of fairness and justice.[6]

While a court has considerable discretion in the admission or exclusion of evidence, because the ICPC home study was not available when this case was heard, the trial court did not actually rule on its admissibility.[7] In fact, the trial court's ruling denied Father's request for continuance pending completion of the ICPC home study. And Father does not challenge that ruling as part of this point. Nor has Father specified when during the hearing he sought to introduce related testimony and was precluded from doing so. No objections were made when the Indiana caseworker testified by phone about the ICPC process and work that had been done on it to date. Father was not prevented from cross-examining this witness. Thus, the issue before this Court on appeal is not related to the exclusion of the study or of certain testimony, but goes instead to whether the trial court erred in denying Father's motion for new trial.

Father's motion for new trial was based on Rule 78.01 and invoked "newly discovered evidence." "Motions for new trials on the ground of newly-discovered [sic] evidence are entertained reluctantly, examined cautiously, and construed strictly." *Roy v. MBW Constr., Inc.*, 477 S.W.3d 678, 686 (Mo. App. W.D. 2015). "A decision on

---

[6] Father argues that the trial court "*specifically ordered* the creation of this evidence in the parallel Abuse and Neglect proceeding, limited testimony which overlapped with the evidence and then effectively excluded the evidence by issuing a ruling before it was available." According to Father, this constituted "improper procedural means to deprive Father of an opportunity to rebut or refute the juvenile officer's flimsy evidence of his unfitness to parent." We do not believe that the cited case supports his "procedural means" argument given that two different proceedings took place here, whereas just one proceeding was involved in the cited case. *Four Star Enters. Equip., Inc. v. Emp'rs Mut. Cas. Co.*, 451 S.W.3d 776, 780-82 (Mo. App. S.D. 2014). In any event, this argument goes to the exclusion of evidence, which is an issue not properly preserved for our review, as addressed below.

[7] "To properly preserve a challenge to the trial court's exclusion of evidence [t]he proponent of the evidence must attempt to present the excluded evidence at trial, and if the evidence remains excluded, then the proponent is required to make an offer of proof." *Payne v. Fiesta Corp.*, 543 S.W.3d 109, 122 (Mo. App. E.D. 2018) (citation omitted).

7

whether to grant a motion for new trial based on newly discovered evidence rests in the sound discretion of the trial court." *In re Nelson*, 891 S.W.2d 181, 183 (Mo. App. W.D. 1995). A new trial will be granted on the basis of newly discovered evidence where specific elements are proven, including that the evidence came to the party's knowledge since trial, "due diligence would not have uncovered the evidence sooner," "the new evidence is so material it would probably produce a different result," and the evidence is not cumulative. *Higgins v. Star Elec., Inc.*, 908 S.W.2d 897, 903 (Mo. App. W.D. 1995).

The ICPC home study attached to Father's motion for new trial as Exhibit B was not provided to Father until after the trial court entered the judgment on January 17, 2020.[8] It appears from the record that Father's counsel reached out repeatedly to learn whether the ICPC home study had been completed and finally learned five days after the judgment was entered that it had been completed. Still, counsel was unable to obtain the home study until early February 2020. This timeline reflects due diligence in uncovering the evidence. This is a close case, and we suggest that this material evidence may have produced a different result. For example, the trial court stated during the hearing that Father was "in a little bit of a Catch 22 here." He had not been represented during or served with notices about the juvenile court proceedings leading to the abandonment determination and was not permitted to contact the Child until the paternity test was completed, so the trial court struggled with whether Father's conduct manifested an intent to abandon the child. The trial court also indicated its willingness

---

[8] According to the record, though the ICPC home study is dated January 6, 2020, it was not approved until January 14, 2020. The trial court's judgment was entered on January 17, 2020, but it was signed January 13, 2020, or one day before the ICPC home study was finally approved.

8

to "accept the results of the ICPC into the record" and to accept it as an exhibit to be considered "along with all the other evidence in the case," if it were completed while the parties prepared post-hearing briefs. Further, while it was apparent from the Indiana caseworker's testimony that Father's residence would be found appropriate, so the actual home study confirming this preliminary assessment would have been cumulative as to that issue, the ICPC home study contains more far-reaching information about Father's intent not to abandon the Child and fitness to parent.

As noted above, even the trial court noted that there would be value in having the home study; that said, if the home study simply described the cleanliness of the apartment and the safety of the neighborhood, that would not be relevant to the issue of abandonment where the trial court focused its analysis. But, this home study *does* provide information that is relevant to abandonment and repentance of abandonment and should have been considered by the trial court.[9]

First and foremost, *both* the Indiana caseworker and supervisor signed the home study, which included the recommendation that the Child "be placed with Father and that the State of Missouri retain jurisdiction for at least six months after placement and not close the case until both Missouri and Indiana agree closure is appropriate for [the

---

[9] Section 211.447.2(2) addresses abandonment as a basis for terminating parental rights, and it requires a determination that a child younger than age one is abandoned. This means that the parent, "without good cause, has left the child without any provision for parental support and without making arrangements to visit or communicate with the child, although able to do so." § 211.447.2(2)(b), RSMo (2016, as supplemented in 2017 and 2018). Case law on abandonment as the basis for termination of parental rights focuses on a parent's intent and often explores whether the parent has repented abandonment. *See, e.g., In re A.R.*, 52 S.W.3d 625, 636 (Mo. App. W.D. 2001) ("Abandonment can be repented by the actual or attempted exercise of parental rights and duties following the abandonment. A parent may repent an abandonment by at least making a reasonable effort to assume parental responsibility and to perform parental duties, in which case the abandonment is no longer a ground for termination of parental rights. [W]hether there has been a repentance requires an examination of the parent's intent, an inferred fact, determined by considering all the evidence of the parent's conduct." (citations omitted)).

9

Child]." This is a significant and probative statement by individuals who are part of Indiana's social services system about Father's status as a caring father who deserves the chance to parent the Child.

The home study also verifies that Father (and girlfriend) have no sex-offender, child-protection, or serious criminal-record histories. And no question has ever been raised about Father being any sort of addict or suffering any disabling mental disability. The home study verifies that "after paying expenses," Father has "a monthly disposable income of $254.00." And the record reflects that the round-trip bus ticket from Indiana to Missouri is $250-$300, and Father took that bus to Missouri as often as he was able and brought some baby supplies with him. In other words, the home study confirms that every cent in Father's possession (after payment of expenses) was going to the Child. This does not appear to reflect a failure to repent abandonment, if Child was abandoned.

The home study notes several times that Father is a spiritual man and that he and his girlfriend "share many values, including their religious faith." The home study confirms that Father himself was raised in a caring and loving family, family is important to Father, and he resides in Indiana to be close to his other children. The home study confirms that nothing is harmful about Father, the girlfriend, the apartment, and the neighborhood. To be certain, Father has made some mistakes in life, but none that were intentionally or recklessly done in a way that was physically or emotionally harmful to the Child who was too young for Father to communicate meaningfully with by phone calls or in writing. Even the trial court observed that Father was "in a Catch 22" with the order prohibiting contact with Child (until paternity was established), but

10

being criticized for "abandoning" the Child by not participating in the Child's life during that time. Father lacks financial resources, but poverty has nothing to do with loving a child. Father wants to "do right" by the Child and has taken positive steps to show love for the Child.[10] We believe that this home study may be persuasive on the issue of Father's intent to be a parent to the Child, and the "testimony" of this home study may very well be the sort of independent and objective evidence that the trial court needs to fully consider the termination decision, particularly where to terminate a parental relationship "has been characterized as tantamount to a civil death penalty." *In re A.G.B.*, 530 S.W.3d 7, 15 (Mo. App. W.D. 2017) (citation omitted). Accordingly, we reverse and remand this case to direct the trial court to consider this home study as evidence on this close call as to the issue of termination of parental rights.

The trial court abused its discretion in overruling Father's motion for new trial on the basis of the newly discovered evidence. Point nine is granted.

## Conclusion

Finding that the trial court abused its discretion in overruling Father's motion for new trial on the basis of newly discovered evidence, we reverse the judgment and remand for the trial court to reconsider its conclusions as to the grounds for termination of parental rights in light of the ICPC home study.

/s/ *Thomas H. Newton*

Thomas H. Newton, Presiding Judge

Mark D. Pfeiffer and Edward R. Ardini, JJ. concur.

---

[10] When testifying about his troubled youth, growing up without a father in the home, Father stated, "[M]y whole point in being a man is being more mature as a man to help my son enough to not make the same mistakes. . . . So that's the whole purpose of me being here, to show my son that he has a father so I can keep him out of the situation that I grew up in."

11